The Honorable John H. Chun

## UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

IN RE VALVE LOOT BOX LITIGATION

Case No. 2:26-cv-00788-JHC

**CONSOLIDATED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 2:26-cv-00788-JHC

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ..................................................................................................1

II.   PARTIES ...............................................................................................................6

      A.    Plaintiffs.....................................................................................................6

      B.    Defendant ...................................................................................................7

III.  JURISDICTION AND VENUE .............................................................................7

IV.   FACTUAL BACKGROUND.................................................................................7

      A.    Valve and the Steam Platform ...................................................................7

      B.    Valve's Flagship Video Game Franchises..................................................8

      C.    Valve's Loot Box System ..........................................................................9

      D.    Valve Designed Its Loot Boxes to Mimic Casino Gambling ..................14

      E.    Valve's Virtual Items Have Real Monetary Value ..................................15

            1.    The Steam Community Market.......................................................16

            2.    Third-Party Marketplaces ..............................................................17

      F.    Valve Employs Experimental Psychologists to Design Loot Boxes
            to Activate the Same Psychological Mechanisms as Casino
            Gambling..................................................................................................19

      G.    The Steam Subscriber Agreement ...........................................................21

      H.    Valve's Loot Boxes Cause Real Harm, Particularly to Children............22

      I.    Valve's Own Conduct in Other Jurisdictions Demonstrates That It
            Has the Capacity and Technical Ability to Modify Its Loot Box
            System to Reduce or Eliminate the Gambling Features Alleged
            Herein.......................................................................................................24

V.    WASHINGTON'S GAMBLING LAWS.............................................................24

VI.   CLASS ACTION ALLEGATIONS .....................................................................25

VII.  CAUSES OF ACTION.........................................................................................27

CONSOLIDATED CLASS ACTION COMPLAINT - i
Case No. 2:26-cv-00788JHC

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

FIRST CAUSE OF ACTION: VIOLATION OF WASHINGTON'S RECOVERY
OF MONEY LOST AT GAMBLING STATUTE, RCW 4.24.070
(On Behalf of Plaintiffs and the Class) ................................................................... 27

SECOND CAUSE OF ACTION: VIOLATIONS OF THE WASHINGTON
CONSUMER PROTECTION ACT, RCW 19.86.010, *et seq.* (On Behalf
of Plaintiffs and the Class) ..................................................................................... 29

THIRD CAUSE OF ACTION: UNJUST ENRICHMENT (On Behalf of Plaintiffs
and the Class) ......................................................................................................... 30

PRAYER FOR RELIEF ................................................................................................. 31

JURY TRIAL DEMANDED ........................................................................................... 32

CONSOLIDATED CLASS ACTION COMPLAINT - ii
Case No. 2:26-cv-00788JHC

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

# I.    INTRODUCTION

1.    Defendant Valve Corporation ("Valve") is a video game developer and distributor that operates Steam, the dominant platform for purchasing and playing PC games, which as of January 2026 had an estimated 132 million monthly active users and 69 million daily users, and commanded an estimated 74% market share for PC game distribution. Valve's three most popular franchises, Counter-Strike[1], Dota, and Team Fortress, have been played by hundreds of millions of people. Counter-Strike 2 alone had an estimated 24 million monthly active players as of mid-2025, with approximately 1.8 million users playing simultaneously during peak periods. Dota 2 is currently estimated to have around 7-8 million monthly active players.

2.    Valve's most popular video games now have gambling built directly into them. In these games, players pay real money—typically a few dollars—to open a virtual container called a "loot box." Inside is a single digital item, such as a decorative design for a weapon used in the game. The player does not get to choose which item they receive. Instead, the item is selected at random by the game's software, like the spin of a roulette wheel. Most of the time, the player receives an item worth only a few cents. On rare occasions, the player receives an item worth hundreds (or even thousands) of dollars. The screen below depicts a loot box in a Valve game, Dota 2: Loot boxes are named based on the possible contents available within them. This loot box is named the "Chest of Endless Days." Players will receive one of the items listed on the left—in each listing, the all-capital name on the left, e.g., "LUNA," refers to the character the item is for, and the sentence-case name on the left, e.g., "Madness of the Amaranth Orb," refers to the item's name. Players have two options depicted in green below the name of the loot box—they can purchase the loot box (or more than one) and purchase a key to unlock that loot box (or more than one). Upon unlocking the loot box, players will receive one of the items in the list, alongside a chance to receive the "rare," "very rare," or "ultra rare" bonus items:

---

[1] Unless stated otherwise, this Complaint will use "Counter-Strike" to describe the franchise (not only the first entry in the franchise)."

CONSOLIDATED CLASS ACTION COMPLAINT - 1
Case No. 2:26-cv-00788JHC

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX



*Figure 1*

3.    In Valve's most popular game, the loot box opening is presented through an animation designed to resemble a slot machine: images of possible items scroll across the screen, spinning fast at first, then slowing to a stop on the player's "prize." Players buy and open loot boxes for the same reason people play slot machines—the hope of a valuable payout. Depicted below is an example of the slot machine type imagery that Valve currently uses when a loot box is opened in Counter-Strike 2: Each of the rectangles containing a picture represents a possible item a player may receive from opening the box. The rectangles rapidly move from right to left, slowing down as the yellow line "lands" on the item the player ultimately receives:

CONSOLIDATED CLASS ACTION COMPLAINT - 2
Case No. 2:26-cv-00788JHC

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX



*Figure 2*

4.      Valve's loot boxes[2] are not incidental features of its games. They are a deliberate, carefully engineered revenue model. The system generates revenue in two ways: first, through the sale of keys,[3] generally starting at a price of around $2.49 per key; and second, through commissions Valve collects when users sell the virtual items they have won through its Steam Community Market. Valve has designed every aspect of this system—the randomized distribution, the tiered rarity structure, the slot-machine-style animations, and the integrated marketplace—to maximize the volume of loot box openings and the revenue Valve derives from them. Valve has sold billions of dollars' worth of loot box keys for Counter-Strike alone. Independent analysts estimate that Valve generated over $1 billion from key sales for Counter-Strike 2 in 2025 alone.

5.      Valve's loot box system constitutes illegal gambling under Washington law. Washington's gambling statutes define "gambling" as "staking or risking something of value upon

_____

[2] The complaint uses "loot box" to refer to any in-game randomized container—including, but not limited to, Counter-Strike Weapons Cases, Team Fortress 2 Mann Co. Supply Crates, and Dota 2 Treasures—the contents of which are determined by chance upon opening.

[3] For ease of reference, this Complaint uses "key" to refer to any payment made to Valve for the right to open a Loot Box, regardless of whether the payment is structured as the purchase of a discrete digital key item (as in Counter-Strike and Team Fortress 2), the direct purchase of a Loot Box, Treasure, or Capsule (as for many Dota 2 treasures), or otherwise.

CONSOLIDATED CLASS ACTION COMPLAINT - 3
Case No. 2:26-cv-00788JHC

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

the outcome of a contest of chance or a future contingent event not under the person's control or influence." RCW 9.46.0237. Valve's loot boxes satisfy every element of this definition: users stake money (the price of opening a loot box) on the outcome of a contest of chance (the random selection of a virtual item), and the items received are "things of value" under RCW 9.46.0285 because they can be sold for credit that users can spend on videogame hardware, software, or to buy additional keys and loot boxes through Valve's own marketplace. Those items can also be exchanged for cash through third-party marketplaces that Valve has authorized, fostered, and facilitated.

6.      Critically, the real monetary value of Valve's virtual items is not an accident—it is a product of Valve's intentional design choices. Valve built and maintains the Steam Community Market, an officially sanctioned, integrated marketplace where users buy and sell virtual items for Steam Wallet funds that function as cash equivalents on the Steam platform. Valve also deliberately designed the Steam platform to enable users to sell virtual items on third-party marketplaces for real money, providing each user with a "Trade URL" that Valve itself instructs users to share on "third-party trading sites." When regulators have inquired about these practices, Valve has claimed that its terms of service prohibit off-platform sales—but internally, Valve has expressly exempted marketplace sites from enforcement, restored their accounts when accidentally suspended, and acknowledged that it does not "fundamentally have an opinion on other uses that people have for their inventories."

7.      The harms caused by this gambling system are real and well-documented. A large-scale survey of over 7,000 gamers published in PLoS ONE found a significant link between loot box spending and the severity of problem gambling—a link that was specific to loot boxes and far stronger than the relationship between problem gambling and other types of in-game spending. That relationship is strongest where, as in Valve's games, the virtual items have real monetary value. When researchers studied adolescents specifically, the results were even more troubling: the link between loot box spending and problem gambling was substantially stronger in 16-to-18-year-olds than in adults.

CONSOLIDATED CLASS ACTION COMPLAINT - 4
Case No. 2:26-cv-00788JHC

8.    Loot boxes use the same psychological techniques as casino games—rewards delivered on unpredictable schedules to keep players spending, visual and audio effects designed to mimic the excitement of a slot machine, "near miss" animations that create the illusion of almost winning, and around-the-clock availability. These techniques are particularly dangerous for children and adolescents, who make up a significant portion of Valve's player base and who are especially vulnerable to developing gambling habits. The Massachusetts Department of Public Health has warned that children introduced to gambling by age twelve are four times more likely to develop problem gambling later in life.

9.    On February 25, 2026, the New York Attorney General filed suit against Valve, alleging that its loot box system violates New York's constitutional prohibition on gambling and its Penal Law provisions governing promoting gambling. That action, while brought under New York law, is premised on the same core factual allegations alleged here: that Valve charges users for a chance to win virtual items of varying value based entirely on chance, that these items have real monetary value, and that Valve has deliberately designed its system to function as a gambling operation.

10.    This action is brought under Washington law—the state where Valve is headquartered and from which it operates its loot box system—on behalf of a nationwide class of consumers who have purchased the right to open loot boxes. Plaintiffs seek recovery of all money lost at gambling under RCW 4.24.070, damages for violations of the Washington Consumer Protection Act, RCW 19.86.010, *et seq.*, and restitution for unjust enrichment.

11.    Under the Subscriber Agreement for the Steam Platform, subscribers agree to be governed by Washington law for all disputes and claims arising out of their relationship with Valve.[4] To play the Counter-Strike series, Dota 2, and Team Fortress 2 and be able to participate in the Steam Community Market, individuals must use Steam and thus agree to these terms.

---

[4] https://store.steampowered.com/subscriber_agreement/ (last visited May 11, 2026).

CONSOLIDATED CLASS ACTION COMPLAINT - 5
Case No. 2:26-cv-00788JHC

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

## II.   PARTIES

**A.    Plaintiffs**

12.   Plaintiff Ivan Galas is a natural person and citizen of the state of Washington. Within the last three years, Plaintiff Galas has maintained a Steam account, purchased loot box keys from Valve, and opened loot boxes in Counter-Strike: Global Offensive and Counter-Strike 2. Plaintiff Galas lost money by purchasing keys to open loot boxes.

13.   Plaintiff Bradley Ousley is a natural person and citizen of the state of Washington. Within the last three years, Plaintiff Ousley has maintained a Steam account, purchased loot box keys from Valve, and opened loot boxes in Counter-Strike: Global Offensive and Counter-Strike 2. Plaintiff Ousley lost money by purchasing keys to open loot boxes.

14.   Plaintiff Robert Brogan is a natural person and citizen of the state of Texas. Within the last three years, Plaintiff Brogan has maintained a Steam account, purchased loot box keys from Valve, and opened loot boxes in Counter-Strike: Global Offensive and Counter-Strike 2. He has purchased loot boxes and keys both for himself, and for his underage son. Plaintiff Brogan lost money by purchasing keys to open loot boxes.

15.   Plaintiff Alexander Flauto is a natural person and citizen of the state of Ohio. Plaintiff Flauto has maintained a Steam account, purchased loot box keys from Valve, and opened loot boxes in Counter-Strike: Global Offensive. Plaintiff Flauto lost money by purchasing keys to open loot boxes.

16.   Plaintiff Carlos Matamoros is a natural person and citizen of the state of Florida. Within the last three years, Plaintiff Matamoros has maintained a Steam account, purchased loot box keys from Valve, and opened loot boxes in Counter-Strike 2. Plaintiff Matamoros lost money by purchasing keys to open loot boxes.

17.   Plaintiff Jackson Meyer is a natural person and citizen of the state of Illinois. Plaintiff Meyer has maintained a Steam account, purchased loot box keys from Valve, and opened loot boxes in Counter-Strike: Global Offensive and Counter-Strike 2. Plaintiff Meyer lost money by purchasing keys to open loot boxes.

CONSOLIDATED CLASS ACTION COMPLAINT - 6
Case No. 2:26-cv-00788JHC

**B.    Defendant**

18.    Defendant Valve Corporation is a Washington corporation headquartered at 10400 NE 4th Street, Suite 1400, Bellevue, Washington 98004. Valve develops and publishes video games, including Counter-Strike 2, Dota 2, and Team Fortress 2. Valve also operates the Steam platform, the dominant digital distribution platform for PC games. As of January 2026, Steam was estimated to have 132 million monthly active users and 69 million daily users.

19.    Valve is a privately held company. Valve has generated billions of dollars in revenue from the sale of the right to open Loot Boxes and commissions on the sale of virtual items through the Steam Community Market. Valve conducts substantial business in this District, throughout Washington State, and throughout the United States.

## III.    JURISDICTION AND VENUE

20.    This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(d)(2) (the Class Action Fairness Act) because (a) at least one member of the proposed class is a citizen of a state different from Defendant, (b) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (c) none of the exceptions under that subsection apply.

21.    This Court has personal jurisdiction over Valve because Valve is headquartered in this District, is incorporated in Washington, and conducts substantial business in this District.

22.    Venue is proper in this District under 28 U.S.C. § 1391(b) because Valve resides in this District and a substantial part of the events giving rise to Plaintiffs' claims occurred in and emanated from this District and Valve has mandated venue in this District in its mandatory user agreement.

## IV.    FACTUAL BACKGROUND

**A.    Valve and the Steam Platform**

23.    Valve was founded in 1996 as a developer and publisher of video games. In 2003, Valve launched the Steam platform, which enabled consumers to directly purchase and download Valve games. Valve later expanded Steam to allow the distribution and sale of PC games published by other companies, collecting a 30% commission on the sale of most third-party games. Steam has

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

grown to become the dominant platform for purchasing, maintaining, and playing PC games, commanding an estimated 74% market share for the distribution of PC games as of 2024.

24. Users can fund their Steam accounts using credit cards, PayPal, or funds stored in a digital wallet called the Steam Wallet. Users can add funds to their Steam Wallet with credit cards or with digital or physical Steam gift cards, which are available at retail stores such as Best Buy. Every dollar deposited in a user's Steam Wallet has the equivalent purchasing power of one dollar on the Steam platform.

**B.      Valve's Flagship Video Game Franchises**

25. Valve's three most popular video game franchises are Counter-Strike, Team Fortress, and Dota. The Counter-Strike franchise is a series of realistic multiplayer first-person shooter games. The franchise experienced explosive growth in popularity with Counter-Strike: Global Offensive ("CS:GO"), released in 2012, which was succeeded by Counter-Strike 2 ("CS 2") in 2023. As of mid-2025, CS 2 was estimated to have 24 million monthly active players, with approximately 1.8 million users playing simultaneously during peak periods. It is consistently the most-played game on the Steam platform.

26. Dota 2 is a multiplayer fantasy-themed battle game that Valve introduced in 2013. According to publicly available Steam data and third-party analysts, Dota 2 has an estimated 7 to 8 million monthly active players, with peak concurrent player counts regularly reaching 700,000 to 900,000.

27. Team Fortress 2 is a multiplayer first-person shooter game with a cartoon aesthetic, released in 2007. Despite being nearly two decades old, it still draws tens of thousands of simultaneous players daily and remains among the twenty most-played games on Steam. All three franchises are fixtures of esports competitions, many of which are sponsored by Valve, and have given rise to thousands of content creators who stream themselves playing the games on platforms such as YouTube and Twitch.

28. Critically, all three of Valve's flagship games have been free to download and play for years. Valve's primary method of monetizing these free games is through its loot box system. That system is enormously profitable. Because Valve is a privately held corporation, it does not

CONSOLIDATED CLASS ACTION COMPLAINT - 8
Case No. 2:26-cv-00788JHC

publicly report its financial results. However, according to data compiled by CS2 Case Tracker, a third-party tracking service, more than 400 million Counter-Strike cases were opened in 2023. Independent analysts have estimated that Valve generated over $1 billion from Counter-Strike loot box key sales alone in 2023, and again in 2025—revenue that does not include the 15% commission Valve collects on every transaction in the Steam Community Market, or any revenue from loot boxes in Dota 2 or Team Fortress 2. In March 2025, Bloomberg reported that the market for Counter-Strike skins alone had surpassed $4.3 billion.

**C.    Valve's Loot Box System**

29.    To make money from its free-to-play games, Valve introduced decorative virtual items into Counter-Strike, Dota 2, and Team Fortress 2. In Counter-Strike, these items are called "skins"—they change the appearance of a player's weapons but have no effect on how the game is played. They are purely cosmetic, valued only for how they look and what they signal to other players about status and spending. An example is depicted below:



*Figure 3:*  An AK-47, a weapon that players can use in Counter-Strike, without (left) and with (right) a cosmetic item ("skin") applied.

30.    Initially, Valve sold some of these virtual items directly on Steam. Within a short time, however, Valve developed a more lucrative method of distribution: selling users a chance to win virtual items through loot boxes. Valve adopted this model for Counter-Strike, Dota 2, and Team Fortress 2.

31.    In Counter-Strike and Team Fortress 2, the player typically buys a separate, single-use digital "key" (currently approximately $2.49 in Counter-Strike) and applies it to open the loot box. In Dota 2, the player typically pays Valve directly to open a loot box (called a "treasure"), without acquiring any separate item; treasures start at approximately $2.49 and can run higher. The

CONSOLIDATED CLASS ACTION COMPLAINT - 9
Case No. 2:26-cv-00788JHC

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

player can purchase the right to open a loot box using a credit card, PayPal, or funds stored in their Steam Wallet. Key purchases and loot box openings take place outside of actual gameplay—no skill is involved and no game is being played. The player simply clicks a button and pays:

 

*Figure 4:* A Counter-Strike Loot Box ("Case") (left) and the Key used to unlock it (right).

32.    When a player opens a loot box, the system randomly selects one virtual item from a list of possible items. The odds of receiving each item are set entirely by Valve. Valve has structured those odds so that the vast majority of items awarded are common and nearly worthless, while a small number of rare items are awarded only a tiny fraction of the time. Players can see which items are possible and how they are grouped by rarity—but Valve does not disclose the actual odds of winning any particular item to users in the United States. The figure below depicts an example of a Valve loot box that does not disclose the specific odds of winning any of the potential items that a user may win from the loot box. Loot boxes are named based on the items available to users from opening them. The below case (upper right) is named the "Dreams & Nightmares Case." Some of the items available from opening the case are shown as square images (left); all items available from opening the case are listed below the image of the case (bottom right). Each row of colored text under "Contains one of the following" represents an item—the text before the "|" is the weapon the cosmetic item is used for (e.g., "MAC-10") and the text after the "|" is the name of the cosmetic item (e.g., "Ensnared"). Each listed item is colored based on rarity in descending order (at bottom being "an Exceedingly Rare Special Item!"), but the actual odds of winning each item are not disclosed.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

*Figure 5:* A Counter-Strike Loot Box ("Case") with the possible cosmetic items listed, with colors representing rarity.

33. Rare items are worth far more on the Valve-authorized Steam Community Market and third-party marketplaces—in some cases thousands of dollars—than the commonly awarded items, which are typically worth only pennies. Nearly every user who buys a key and opens a loot box receives a common item worth far less than the $2.49 spent on the key. According to one analysis, the odds of winning the most valuable item from one particular Counter-Strike weapons case—a Gamma Doppler Emerald Butterfly Knife worth over $10,000—are approximately one in 146,000.

34. Any user who actually wanted one of the commonly awarded items could obtain it far more cheaply by simply purchasing it on Valve's authorized Steam Community Market. Users

CONSOLIDATED CLASS ACTION COMPLAINT - 11
Case No. 2:26-cv-00788JHC

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

purchase the right to open loot boxes for the same reason people play the lottery or a slot machine: the potential of winning a valuable prize.

35.    To illustrate: a player who pays $2.49 to open a Counter-Strike weapons case will almost certainly receive an item worth a few cents—an item that could have been purchased directly on the Steam Community Market for far less than the price of the key. According to one analysis, roughly 96% of items awarded from Counter-Strike loot boxes are worth less than the key used to open the case. But on rare occasions, a player wins an item worth hundreds or even thousands of dollars. The odds of winning one of the rarest items from a single case opening have been estimated at approximately one in 146,000. It is this possibility—remote but tantalizing—that drives players to keep buying keys and opening loot boxes. As one Valve developer acknowledged early in the development of the loot box system, Valve understood that users who spent $2.49 on a key and received an item worth $0.50 would feel they had "just lost $2 of actual value." Valve proceeded anyway.

36.    The loot box system works the same way across all three of Valve's flagship games. In each game, users pay a fee, generally starting at around $2.50, for the right to open a loot box and receive a randomly selected cosmetic item, with Valve controlling the odds. The specific types of items differ across the games—ranging from weapon skins and attachments to character apparel—but the underlying mechanic is identical, as depicted below:

CONSOLIDATED CLASS ACTION COMPLAINT - 12
Case No. 2:26-cv-00788JHC

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX



*Figure 6:*  Team Fortress 2 Loot Box ("Supply Crate") with possible items listed, including "an Exceedingly Rare" item.



*Figure 7*: TF2 Loot Box opened.

*Figure 8:* Dota 2 Loot Box ("Treasures") with possible items listed, including "a chance to receive bonus items."

CONSOLIDATED CLASS ACTION COMPLAINT - 13
Case No. 2:26-cv-00788JHC

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

**D.      Valve Designed Its Loot Boxes to Mimic Casino Gambling**

37.      Valve designed the experience of opening a loot box to resemble a virtual slot machine. In Counter-Strike, when a user opens a weapons case, an animation displays a simulated spinning wheel with images of the various possible items rotating across the display, as seen in the linked video.[5] Like a slot machine, the wheel spins rapidly at first and then gradually slows. When it finally stops, the item in the center of the display is awarded to the user as depicted in Figure 10, below:



*Figure 9:*  Counter-Strike Loot Box ("Case"), with the possible items players can receive from opening the loot box listed below the loot box (the rectangular icons).

38.      Also like a slot machine, Valve's spinning wheel is designed to convey the illusion of a "near miss"—the wheel could come to rest immediately next to the icon for a rare and valuable item, such as a knife worth ten thousand dollars, giving users the impression they "almost" won. The spinning wheel animation displays items of varying rarity scrolling past the selection market, replicating the visual rhythm and anticipatory mechanics of a slot machine. In reality, the item awarded is determined by a random number generator on Valve's server after the user clicks the button to open the case, and the visual animation has no bearing on the outcome as depicted:

---

[5] Screen recorded video from https://www.youtube.com/watch?v=tMwcgC4uIwg (last visited May 11, 2026).

CONSOLIDATED CLASS ACTION COMPLAINT - 14
Case No. 2:26-cv-00788JHC

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX



*Figure 10:* Counter-Strike "wheel" of items.



*Figure 11:* Dota 2 "wheel" where items gradually disappear, leaving one item.

39.     None of Valve's loot box games require or depend on any amount of skill to determine their outcomes—all outcomes are based entirely on chance. The user presses a button to open the loot box; no further action on the user's part is required or possible. Valve's servers execute algorithms that determine the outcome, and Valve adjusts the user's account balance to reflect the result. Valve keeps records of each wager, outcome, win, and loss for every user.

40.     Opening loot boxes has become a subject of interest distinct from playing Valve's games. Popular streamers have created video channels dedicated solely to opening loot boxes, touting the cash value of valuable items won. This content generally includes no actual gameplay, consisting instead of users opening one case after another in rapid succession—indistinguishable in form and function from videos of casino slot machine sessions.

**E.     Valve's Virtual Items Have Real Monetary Value**

41.     The virtual items distributed through Valve's loot boxes are not tokens with value only inside a game. They are items that can be—and routinely are—bought and sold for real money. That is not an accident. Valve deliberately designed both its games and its platform to create and sustain a real-money market for these items, and Valve operates and profits from the authorized marketplace infrastructure through which these transactions occur.

CONSOLIDATED CLASS ACTION COMPLAINT - 15
Case No. 2:26-cv-00788JHC

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

### 1.    The Steam Community Market

42.    Valve built and operates the Steam Community Market, an authorized and officially sanctioned marketplace where players buy and sell virtual items. The Steam Community Market is a core feature of Valve's Steam ecosystem, fully integrated into the platform and maintained by Valve itself. The process is simple: a player selects an item, sets a price, and lists it for sale. Depicted below is a screen that Steam Market users see before listing an item for sale, which shows users the median sale prices of the item on the Steam Market (*see Figure 12*). Valve takes a 15% commission on every transaction. The buyer pays with Steam Wallet funds, which have the purchasing power of cash on the Steam platform—they can be used to buy any of the more than 146,000 games available on Steam, as well as hardware, loot box keys, and other items.



*Figure 12*:  A screen the user sees before putting an item on the Steam Market for sale, which includes graph showing the median sale price of that item on the Steam Market over time.

43.    Players can also effectively convert their virtual items into real cash. Steam Wallet funds can be used to purchase physical goods through Steam—including gaming hardware like the

CONSOLIDATED CLASS ACTION COMPLAINT - 16
Case No. 2:26-cv-00788JHC

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

Steam Deck—which can then be resold. More directly, players can sell their virtual items for cash on third-party marketplaces that Valve knowingly facilitates through its authorized trading infrastructure.

44.    Valve has built market research tools directly into the Steam platform that allow players to track the price history of virtual items over time, view current buy and sell offers, and analyze price trends—tools that look and function like those found on stock trading platforms. By providing these authorized trading tools, Valve reinforces the monetary value of the items and encourages players to engage with the loot box system as a form of speculation. Depicted below is a graph shown to Steam Market users when viewing an item. That graph shows median sale prices for that item on the Steam Market:



*Figure 13:*  Data available to Steam users on Steam, here the median sale prices of the item.

### 2.    Third-Party Marketplaces

45.    Valve designed the Steam platform to facilitate the purchase and sale of virtual items on third-party marketplaces. Valve provides each Steam user with a "Trade URL" and instructs users that it can be shared "on third-party trading sites" (*see Figure 14*, below). By providing this sanctioned trading infrastructure, Valve has effectively authorized and enabled third-party marketplaces to operate as extensions of its own ecosystem. Third-party marketplaces allow users to sell virtual items for cash—not merely Steam Wallet funds—and, unlike the Steam

CONSOLIDATED CLASS ACTION COMPLAINT - 17
Case No. 2:26-cv-00788JHC

Community Market, do not cap transaction amounts, enabling users to sell rare items for tens of thousands of dollars.

*Figure 14:* Steam provides users with a link they can paste elsewhere; others can use this link to find the user and trade with them. Users are told by Steam that they can paste this link onto third-party trading sites—presumably, the payment for the item is made on the third-party trading site and the payee clicks the link to convey the item to the payor on Steam.

46.     On information and belief, Valve has at all relevant times been aware of and facilitated the operation of third-party marketplaces for its virtual items. While Valve has occasionally acted against skins gambling sites, it has not enforced its terms of service against cash marketplace sites. A senior Valve employee stated publicly in 2017 that Valve does not "fundamentally have an opinion on other uses that people have for their inventories." On information and belief, Valve has expressly exempted marketplace sites from enforcement campaigns, restored their accounts when inadvertently suspended, and assisted marketplace operators in maintaining access to Steam's authorized trading infrastructure.

47.     The result of Valve's deliberate design choices is a virtual economy of staggering scale. Industry analysts have described these items as "a distinct investment class." Bloomberg has reported on the Counter-Strike skin market alongside coverage of stocks, bitcoin, and other financial assets. Individual skins have sold for over $1 million. The high value and easy liquidation of these items have made them targets for theft—Valve has acknowledged receiving approximately 77,000 reports of hijacked accounts per month and has implemented multiple security measures

CONSOLIDATED CLASS ACTION COMPLAINT - 18
Case No. 2:26-cv-00788JHC

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

specifically to combat the theft of virtual items, further confirming the real monetary value that Valve's own authorized trading system has created.

**F.    Valve Employs Experimental Psychologists to Design Loot Boxes to Activate the Same Psychological Mechanisms as Casino Gambling**

48.    Valve's loot boxes are not just gambling in a legal sense. They are designed to work like gambling—using the same psychological techniques that casino game manufacturers have refined over decades to keep people spending money.

49.    For 14 years, Valve employed experimental psychologist Dr. Mike Ambinder to help design its games. Dr. Ambinder has publicly discussed how Valve exploits players' psychology to keep them opening loot boxes.

50.    *Endowment effect.* Valve gives players free loot boxes through drops as they play. Those loot boxes go into a player's personal Steam inventory. Once a case is in a player's inventory, it belongs to the player. Players value these loot boxes and their potential contents more because they already own them. This is called the endowment effect, in which individuals place a higher value on a good when they are endowed with it, compared to when they are not. The endowment effect makes the player feel that the purchase price of a key is minor in comparison to what they stand to gain by opening their loot box, even though statistically they are unlikely to receive an item worth more than the key cost. Dr. Ambinder wrote that because of cognitive biases, "decisions can be influenced and shaped in somewhat predictable ways."[6]

51.    *Unpredictable reward schedules.* Slot machines are addictive in large part because they deliver rewards on unpredictable schedules—a mechanism psychologists call variable ratio reinforcement. Valve's loot boxes use the same technique. The player never knows when a valuable item might appear, which is precisely what keeps them buying the next key.

52.    *Slot-machine sensory design.* The spinning display and accompanying sounds that play when a user opens a Valve loot box are designed to mimic the sensory experience of a slot machine—the same visual and audio cues that slot machine manufacturers use to hold players'

---

[6] Dr. Mike Ambinder, The Psychology of Game Design, Steam Dev Days, October 13, 2016, https://cdn.akamai.steamstatic.com/apps/steamdevdays/slides2016/PsychologyOfGameDesign.pdf at Slide 29 (last accessed April 29, 2026).

CONSOLIDATED CLASS ACTION COMPLAINT - 19
Case No. 2:26-cv-00788JHC

attention and encourage continued play. Dr. Ambinder acknowledged that such visual effects "capture attention."[7]

53.    ***Near-miss illusions.*** Valve's spinning wheel periodically scrolls past and then comes to rest immediately next to a rare, valuable item, giving the player the impression that they "almost" won. This is a well-documented technique used in slot machines called a "near miss"—and it is effective at encouraging players to try again, even though the outcome was determined by a random number generator before the wheel ever started spinning. The near-miss effect can significantly impact player behavior. Although near-misses are losses, they prolong play—players chase the anticipated win, grow more excited and emotionally engaged, and develop a false sense of momentum.

54.    ***Chasing losses.*** Nearly every loot box opening results in an item worth less than the price of the key. Players who have already spent money on keys and received low-value items are driven to keep spending in the hope of winning something valuable enough to justify their earlier losses—the same cycle that characterizes problem gambling in casinos.

55.    ***Around-the-clock availability.*** Unlike a physical casino, Valve's loot boxes are available 24 hours a day, seven days a week, from any computer or device with an internet connection. There is no closing time and no one checking IDs at the door.

56.    Government regulators allow casinos to implement these psychological techniques in part because state regulations impose safeguards to protect players engaged in legal gambling, none of which are present with Valve's loot boxes.

57.    Under Washington law, legal casinos:

    a.    Must prevent those under the age of 18 from participating under WAC 230-06-010;

    b.    Can conduct gambling activities on licensed premises only under WAC 230-06-045;

    c.    Must prevent intoxicated persons from playing under WAC 230-06-015;

---

[7] Dr. Mike Ambinder, The Psychology of Game Design, Steam Dev Days, October 13, 2016, https://cdn.akamai.steamstatic.com/apps/steamdevdays/slides2016/PsychologyOfGameDesign.pdf at Slide 9 (last visited April 29, 2026).

CONSOLIDATED CLASS ACTION COMPLAINT - 20
Case No. 2:26-cv-00788JHC

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

d.  Cannot accept credit cards as payment for participation in gambling activities under WAC 230-06-035(3);

e.  Must conspicuously post "responsible gambling informational signs, which include a responsible gambling message and a toll-free helpline number for problem gambling and gambling disorders" under WAC 230-06-068; and

f.  Must allow self-identified problem gamblers to place themselves on a self-exclusion list which bars them from gambling establishments (WAC 230-23).

58.     Valve provides none of these safeguards for loot box users. Players can open loot boxes anywhere, anytime, regardless of whether they are 18, and regardless of whether they have been drinking. Valve provides no responsible gambling information or helpline. Players can buy keys with credit cards.

59.     The gambling nature of Valve's loot boxes is visible in the culture that has grown up around them. Popular streamers on platforms like YouTube and Twitch have built audiences of millions by filming themselves opening loot boxes in rapid succession—not playing the games, but simply opening one case after another and reacting to the results. These videos prominently display the cash value of any valuable items won.

**G.     The Steam Subscriber Agreement**

60.     To use Steam—and therefore to play Counter-Strike, Dota 2, or Team Fortress 2, or to buy or sell items on the Steam Community Market—a person must first create a Steam account. Creating an account requires the person to agree to Valve's Steam Subscriber Agreement (the "Subscriber Agreement"), a standard-form contract drafted entirely by Valve.

61.     The Subscriber Agreement provides that, for all subscribers outside the European Union and the United Kingdom, Washington law "governs all disputes and claims arising out of or relating to (i) any aspect of the relationship between us; (ii) this Agreement; or (iii) your use of Steam, your Account or the Content and Services." The agreement further provides that "all disputes and claims between you and Valve ... shall be commenced and maintained exclusively in any state or federal court located in King County, Washington."

CONSOLIDATED CLASS ACTION COMPLAINT - 21
Case No. 2:26-cv-00788JHC

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

62. Valve can modify the Subscriber Agreement unilaterally at any time. Under Section 8 of the agreement, Valve may amend any of its terms "in its sole discretion," and a subscriber's failure to cancel their account within 30 days of notice constitutes acceptance of the new terms.

**H.    Valve's Loot Boxes Cause Real Harm, Particularly to Children**

63. The connection between loot boxes and gambling is not a matter of opinion. It has been the subject of sustained academic study, and the results are consistent and alarming. In 2018, researchers David Zendle and Paul Cairns published a large-scale survey of 7,422 gamers and found a significant link between the amount individuals spent on loot boxes and the severity of their problem gambling.[8] Critically, this link was specific to loot boxes—it was far stronger than the relationship between problem gambling and spending on other types of in-game purchases, suggesting that it is the gambling-like features of loot boxes, not simply the act of spending money in a game, that drive the relationship. These findings were replicated in a second independent study in 2019.[9] Subsequent meta-analyses have confirmed a significant positive correlation between loot box spending and problem gambling symptoms across the literature.[10]

64. Zendle later explored whether purchasing trading cards was linked to gambling. A large-scale survey again found a link between the amount spent on Loot Boxes and the severity of gambling behavior. It found no such link between trading cards and problem gambling. In part, the study concluded that loot boxes led to problematic gambling behavior because video game companies used the gambling-like psychological tools described above. Trading cards did not lead to problematic gambling behavior because they did not use those tools.[11]

65. The research on children is worse. In 2019, Zendle, Meyer, and Over published the first study specifically examining loot box spending and problem gambling in adolescents,

---

[8] Zendle, D. & Cairns, P., "Video game loot boxes are linked to problem gambling: Results of a large-scale survey," PLoS ONE 13(11): e0206767 (Nov. 21, 2018). [n=7,422 gamers; link stronger for loot boxes than other microtransactions].

[9] Zendle, D. & Cairns, P., "Loot boxes are again linked to problem gambling: Results of a replication study," PLoS ONE 14(3): e0213194 (Mar. 7, 2019). [n=1,172; replication].

[10] Hing, N. et al., "Loot box purchasing is linked to problem gambling in adolescents when controlling for monetary gambling participation," PMC (2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC9295209/ (last visited May 7, 2026).

[11] Zendle, D. Links Between Problem Gambling and Spending on Booster Packs in Collectible Card Games: A Conceptual Replication of Research on Loot Boxes (2019), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0247855 (last visited April 30, 2026).

CONSOLIDATED CLASS ACTION COMPLAINT - 22
Case No. 2:26-cv-00788JHC

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

surveying 1,155 young people aged 16 to 18.[12] The results showed that the link between loot box spending and problem gambling was not just present in adolescents—it was substantially stronger than the relationship previously observed in adults. The researchers concluded that loot boxes either cause problem gambling in adolescents, allow game companies to profit from adolescents with gambling problems, or both.

66.    These findings are consistent with what public health officials and researchers have long understood about young people and gambling. A 2021 report commissioned by GambleAware—a leading UK public health body—identified several reasons why adolescents are especially vulnerable to loot box mechanics: neurodevelopmental immaturity linked to reduced impulse control; a lack of effective coping strategies for the challenges of adolescence, leading to greater urges for the kind of "escape" that gambling provides; and heightened susceptibility to peer pressure, where social networks normalize high-risk spending behavior.[13] The Massachusetts Department of Public Health has warned that children introduced to gambling by age 12 are four times more likely to develop problem gambling later in life.[14]

67.    The consequences of problem gambling are devastating at any age, but for children they can be life-altering. According to the American Psychiatric Association, gambling disorder carries the highest suicide risk of any substance use or addictive disorder.[15] Health officials have documented that gambling disorders are associated with severe financial consequences—including debt, asset loss, and bankruptcy—as well as anxiety, depression, insomnia, substance use disorders, and suicidal ideation.[16] A 2025 study in a peer-reviewed journal concluded that problem gambling

---

[12] Zendle, D., Meyer, R. & Over, H., "Adolescents and loot boxes: links with problem gambling and motivations for purchase," Royal Society Open Science 6(6): 190049 (June 19, 2019). [n=1,155; ages 16-18; effect size $\eta^2=0.120$, substantially stronger than the $\eta^2=0.054$ found in adults].

[13] Close, J. & Lloyd, J., "Lifting the Lid on Loot-Boxes: Chance-Based Purchases in Video Games and the Convergence of Gaming and Gambling," GambleAware (Apr. 2021), at 27.

[14] Massachusetts Department of Public Health, "Teens gambling. It's a risk," https://www.mass.gov/info-details/teens-gambling-its-a-risk [children introduced to gambling by age 12 are four times more likely to develop problem gambling] (last visited May 7, 2026).

[15] American Psychiatric Association, "What is Gambling Disorder?", https://www.psychiatry.org/patients-families/gambling-disorder/what-is-gambling-disorder (last visited May 7, 2026).

[16] New York State Office of Addiction Services and Supports, "Addiction Data Bulletin 5: The Gambling Risk Environment and Public Perceptions of Gambling in New York State," at 3 (Apr. 2025).

CONSOLIDATED CLASS ACTION COMPLAINT - 23
Case No. 2:26-cv-00788JHC

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

during adolescence "most likely leads to depression, self-injury, and further addictive behaviors, which ultimately ruin adolescents' lives."[17]

68.    Despite all of this, Valve does nothing meaningful to keep children away from its loot boxes. To create a Steam account, a user need only click a checkbox next to a statement that they are 13 or older. There is no age verification. There is no parental consent mechanism. There is nothing stopping a child from spending hundreds of dollars on loot box keys with a parent's stored credit card or a Steam gift card purchased at a retail store for cash. Valve knows that children and teenagers are among its most dedicated players—teenage boys are a core audience for Counter-Strike. Valve has chosen to profit from a gambling system it knows children use, while doing nothing to protect them from it.

I.    **Valve's Own Conduct in Other Jurisdictions Demonstrates That It Has the Capacity and Technical Ability to Modify Its Loot Box System to Reduce or Eliminate the Gambling Features Alleged Herein**

69.    In 2018, Valve disabled the ability of users in Belgium and the Netherlands to open Counter-Strike loot boxes entirely and restricted trading of loot box items in those countries, after government agencies in both countries concluded that loot boxes constitute unlawful gambling. Valve also modified its system to comply with Chinese regulations requiring disclosure of loot box odds, publishing the probabilities of receiving items from each rarity tier for its Counter-Strike weapons cases in China. These changes confirm that Valve possesses the technical infrastructure to restrict or modify its loot box system on a jurisdiction-by-jurisdiction basis, and has chosen to do so abroad while continuing to operate an unregulated gambling system in the United States.

## V.    WASHINGTON'S GAMBLING LAWS

70.    The state of Washington closely regulates gambling and has declared a strong public policy against unregulated gambling. RCW 9.46.010 provides:

> The public policy of the state of Washington on gambling is to keep the criminal element out of gambling and to promote the social welfare of the people by limiting the nature and scope of gambling activities and by strict regulation and control.

---

[17] Lee, H.J. & Lee, G., "Pathways to understanding problem gambling among adolescents," PMC (June 10, 2025), https://pmc.ncbi.nlm.nih.gov/articles/PMC12150549/ (last visited May 11, 2026).

CONSOLIDATED CLASS ACTION COMPLAINT - 24
Case No. 2:26-cv-00788JHC

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

71.     "Gambling" is broadly defined under Washington law. RCW 9.46.0237 provides that gambling "means staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence." Critically, the legislature defined "gambling" in broad and technology neutral terms.

72.     "Thing of value" is defined by RCW 9.46.0285 to include "any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise, directly or indirectly, contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge."

73.     Washington's Recovery of Money Lost at Gambling statute, RCW 4.24.070, provides that "all persons losing money or anything of value at or on any illegal gambling games shall have a cause of action to recover from the dealer or player winning, or from the proprietor for whose benefit such game was played or dealt, or such money or things of value won, the amount of the money or the value of the thing so lost."

74.     A "contest of chance" is defined by RCW 9.46.0225 as a "contest, game, gaming scheme, or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein."

## VI.     CLASS ACTION ALLEGATIONS

75.     **Class Definition.** Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(a), (b)(1), (b)(2), (b)(3), and/or (c)(4) on behalf of themselves and a Class of similarly situated individuals defined as follows (together, the "Class"):

> **Nationwide Class:** All persons in the United States who (1) purchased the right to open a Loot Box[18] in connection with the Counter-Strike (including CS:GO and CS 2), Dota 2, or Team Fortress 2 (the "Valve Games") and/or (2) are parents/guardians of a minor child who purchased the right to open a Loot Box in connection with the Valve Games.

---

[18] Loot Box" refers to any in-game randomized container—including but not limited to Counter-Strike Weapons Cases, Team Fortress 2 Mann Co. Supply Crates, and Dota 2 Treasures—the contents of which are determined by chance upon opening.

CONSOLIDATED CLASS ACTION COMPLAINT - 25
Case No. 2:26-cv-00788JHC

76.    Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, its subsidiaries, parents, successors, predecessors, and any entity in which Defendant has a controlling interest, and their current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

77.    **Numerosity.** On information and belief, millions of consumers fall within the Class definition. Valve has sold billions of dollars' worth of the right to open Loot Boxes to users worldwide. Members of the Class can be identified through Valve's records.

78.    **Commonality and Predominance.** There are many questions of law and fact common to the claims of Plaintiffs and the Class, and those questions predominate over any questions that may affect individual members. Common questions include, but are not limited to: (a) whether Valve's loot boxes constitute "gambling" as defined by RCW 9.46.0237; (b) whether Valve is the proprietor for whose benefit the gambling games are played; (c) whether the virtual items awarded through loot boxes are "things of value" under RCW 9.46.0285; (d) whether Plaintiffs and each member of the Class lost money or things of value by gambling; (e) whether Valve violated the Washington Consumer Protection Act, RCW 19.86.010, *et seq.*; and (f) whether Valve has been unjustly enriched.

79.    **Typicality.** Plaintiffs' claims are typical of the claims of other members of the Class. Plaintiffs and each Class member sustained damages arising out of the same course of unlawful conduct by Valve.

80.    **Adequacy.** Plaintiffs will fairly and adequately represent and protect the interests of the Class and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interests antagonistic to those of the Class, and Valve has no defenses unique to Plaintiffs.

81.    **Superiority.** A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The harm suffered by individual Class members is likely

CONSOLIDATED CLASS ACTION COMPLAINT - 26
Case No. 2:26-cv-00788JHC

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

to have been relatively small compared to the burden and expense of individual litigation. Absent a class action, it would be difficult or impossible for individual Class members to obtain effective relief.

82.     Class Certification is also appropriate under Rules 23(b)(1), (b)(2), and/or (c)(4) because:

     a.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications establishing incompatible standards of conduct for Defendant;

     b.  The prosecution of separate actions by individual Class members would create a risk of adjudications that would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or would substantially impair or impede their ability to protect their interests;

     c.  Defendant has acted or refused to act on grounds generally applicable to the Class, making injunctive and corresponding declarative relief appropriate with respect to the Class as a whole; and

     d.  The claims of Class members are comprised of common issues whose resolution in a class trial would materially advance this litigation.

83.     Plaintiffs reserve the right to revise the foregoing class allegations and class definitions based on facts learned through investigation and discovery.

## VII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION:

**VIOLATION OF WASHINGTON'S RECOVERY OF MONEY
LOST AT GAMBLING STATUTE, RCW 4.24.070
(On Behalf of Plaintiffs and the Class)**

84.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

85.     Plaintiffs, members of the Class, and Defendant are all "persons" as defined by RCW 9.46.0289.

86.     RCW 4.24.070 provides that "all persons losing money or anything of value at or on any illegal gambling games shall have a cause of action to recover from the dealer or player

CONSOLIDATED CLASS ACTION COMPLAINT - 27
Case No. 2:26-cv-00788JHC

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

winning, or from the proprietor for whose benefit such game was played or dealt, or such money or things of value won, the amount of the money or the value of the thing so lost."

87. Plaintiffs and the Class gambled each time they purchased the right to open a Valve Loot Box and opened it. Each loot box opening satisfies every element of "gambling" as defined by RCW 9.46.0237.

88. First, the player stakes something of value. The player pays Valve $2.49 for a key—real money, charged to a credit card, PayPal account, or Steam Wallet funded with real money.

89. Second, the outcome depends entirely on chance. A random number generator on Valve's servers selects the virtual item the player receives. The player has no control or influence over the outcome. No skill is involved, no strategy is possible, and no action by the player after clicking the button to open the loot box can affect the result.

90. Third, the player receives a thing of value. The virtual item awarded can be sold for real money through Valve's authorized Steam Community Market or through the third-party marketplaces that Valve has sanctioned and facilitated, functions as a credit or token exchangeable for money or property, and constitutes an extension of entertainment or a privilege of playing at a game.

91. Valve's loot boxes are "contests of chance" as defined by RCW 9.46.0225 because the outcome of each loot box opening depends entirely upon an element of chance. A player's skill does not affect the outcome in any degree. Valve's loot boxes are not "amusement games" as defined by RCW 9.46.0201 because their outcomes do not depend in a material degree upon the skill of the contestant. The virtual items are "things of value" under RCW 9.46.0285 not merely because they have abstract utility within a game, but because Valve deliberately designed its platform to ensure they could be bought and sold for real money—through the authorized Steam Community Market that Valve built and operates, and through the third-party marketplaces that Valve has knowingly sanctioned, fostered, and facilitated.

92. The right to open Valve Loot Boxes that Plaintiffs and the Class purchased from Valve, and the virtual items they stood to win, are "things of value" under RCW 9.46.0285. The keys are purchased with real money. The virtual items can be exchanged for money or property

CONSOLIDATED CLASS ACTION COMPLAINT - 28
Case No. 2:26-cv-00788JHC

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

through Valve's authorized Steam Community Market and through the third-party marketplaces Valve has sanctioned, constitute credits involving the extension of entertainment and a privilege of playing a game without charge, and are tokens or articles exchangeable for money or property.

93. Valve's loot boxes are not "amusement games" as defined by RCW 9.46.0201 because their outcomes do not depend in a material degree upon the skill of the contestant.

94. Valve is the proprietor for whose benefit the loot box gambling games are played. Valve designed, developed, operates, and profits from the loot box system.

95. As a direct and proximate result of Valve's operation of its loot box gambling games, Plaintiffs and each member of the Class lost money by purchasing keys to open loot boxes. Plaintiffs, on behalf of themselves and the Class, seek an order (1) requiring Valve to cease the operation of its illegal gambling games; and/or (2) awarding the recovery of all lost monies, interest, and reasonable attorneys' fees, expenses, and costs to the extent allowable.

### SECOND CAUSE OF ACTION:

**VIOLATIONS OF THE WASHINGTON CONSUMER
PROTECTION ACT, RCW 19.86.010, *et seq.*
(On Behalf of Plaintiffs and the Class)**

96. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

97. Washington's Consumer Protection Act, RCW 19.86.010, *et seq.* ("CPA"), prohibits "unfair methods of competition or unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020.

98. A claimant may establish that an act or practice is injurious to the public interest because it "Violates a statute that contains a specific legislative declaration of public interest impact."

99. Valve has violated RCW 9.46.010, *et seq.*, which contains a specific legislative declaration of public interest impact, by operating illegal gambling games through its loot box system, as alleged herein.

100. Valve's wrongful conduct occurred in the conduct of trade or commerce—while Valve was engaged in the business of operating and monetizing its video games and the Steam platform.

CONSOLIDATED CLASS ACTION COMPLAINT - 29
Case No. 2:26-cv-00788JHC



101. Valve's acts and practices were and are injurious to the public interest because Valve, in the course of its business, continuously advertised to and solicited the general public in Washington and throughout the United States to play its unlawful gambling games. This was part of a pattern and generalized course of conduct, and many consumers have been adversely affected.

102. Valve's unfair and deceptive conduct includes, but is not limited to: (a) operating loot box gambling games without authorization under Washington's gambling laws; (b) designing loot boxes to exploit the same psychological mechanisms as casino games, including slot-machine-style animations, near-miss illusions, and variable ratio reinforcement; (c) marketing loot boxes to children and adolescents without meaningful age verification; (d) publicly claiming that its terms of service prohibit the off-platform sale of virtual items for cash while simultaneously sanctioning, facilitating, and profiting from the existence of cash marketplaces through its authorized trading infrastructure; and (e) failing to disclose to users the odds of receiving items of different values from loot boxes in a manner accessible to users in the United States, despite having disclosed such odds in other jurisdictions to comply with foreign regulations.

103. As a result of Valve's conduct, Plaintiffs and the Class were injured in their business or property in that they lost money wagering on Valve's unlawful games of chance. Valve's unfair or deceptive conduct proximately caused these injuries because, but for the challenged conduct, Plaintiffs and the Class would not have lost money on Valve's loot boxes.

104. Plaintiffs, on behalf of themselves and the Class, seek to enjoin further violations and recover actual damages and treble damages, together with the costs of suit, including reasonable attorneys' fees.

### THIRD CAUSE OF ACTION:

### UNJUST ENRICHMENT
**(On Behalf of Plaintiffs and the Class)**

105. Plaintiffs incorporate by reference the foregoing allegations as if fully set forth herein.

106. Plaintiffs and the Class have conferred a benefit upon Valve in the form of the money Valve received from them for the purchase of loot box keys and the opening of loot boxes.

CONSOLIDATED CLASS ACTION COMPLAINT - 30
Case No. 2:26-cv-00788JHC

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

107. Valve appreciates and has knowledge of the benefits conferred upon it by Plaintiffs and the Class.

108. Under principles of equity and good conscience, Valve should not be permitted to retain the money obtained from Plaintiffs and members of the Class, which Valve unjustly obtained as a result of its unlawful operation of gambling games. Valve has retained billions of dollars in profits generated from its unlawful loot box system and should not be permitted to retain those ill-gotten profits.

109. Accordingly, Plaintiffs and the Class seek full disgorgement and restitution of any money Valve has retained as a result of the unlawful conduct alleged herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully requests that this Court enter an Order:

A. Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiffs as representatives of the Class, and appointing their counsel as class counsel;

B. Declaring that Valve's conduct, as set forth above, violates RCW 4.24.070 and the Washington Consumer Protection Act;

C. Entering judgment against Valve in the amount of the losses suffered by Plaintiffs and each member of the Class;

D. Enjoining Valve from continuing the challenged conduct;

E. Awarding damages to Plaintiffs and the Class members in an amount to be determined at trial, including trebling as appropriate under the CPA;

F. Awarding restitution to Plaintiffs and the Class members in an amount to be determined at trial, and requiring disgorgement of all benefits that Valve unjustly received;

G. Awarding reasonable attorneys' fees and expenses;

H. Awarding pre- and post-judgment interest, to the extent allowable;

I. Entering judgment for injunctive and/or declaratory relief as necessary to protect the interests of Plaintiffs and the Class; and

J. Awarding such other and further relief as equity and justice require.

CONSOLIDATED CLASS ACTION COMPLAINT - 31
Case No. 2:26-cv-00788JHC

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

**JURY TRIAL DEMANDED**

Plaintiffs request a trial by jury of all claims that can be so tried.

DATED this 11th day of May, 2026.

Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By: */s/ Steve W. Berman*
　　　Steve W. Berman (WSBA #12536)
By: */s/ Moses Jehng*
　　　Moses Jehng (WSBA #64333)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
moses.jehng@hbsslaw.com

Ben Harrington (*pro hac vice*)
Rio S. Pierce (*pro hac vice*)
Roxana Moussavian (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
benh@hbsslaw.com
riop@hbsslaw.com
roxana.moussavian@hbsslaw.com

*Interim Lead Counsel and Counsel for Alexander Flauto, Jackson Meyer, Ivan Galas, and Robert Brogan*

**MILBERG, PLLC**

By:  */s/ Douglas H. Sanders*
　　　Douglas H. Sanders (*pro hac vice forthcoming*)
1311 Avenida Ponce De Leon, Suite 600
San Juan, Puerto Rico 00917
Telephone: (516) 206-7616
Facsimile:  (516) 282-7888
dsanders@milberg.com

CONSOLIDATED CLASS ACTION COMPLAINT - 32
Case No. 2:26-cv-00788JHC



Gary M. Klinger (*pro hac vice forthcoming*)
William J. Edelman (*pro hac vice forthcoming*)
Michael A. Acciavatti (*pro hac vice*)
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
gklinger@milberg.com
wedelman@milberg.com
macciavatti@milberg.com

Adam E. Polk (*pro hac vice*)
Simon Grille (*pro hac vice*)
Fatima Ladha (*pro hac vice*)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile:  (415) 981-4846
apolk@girardsharp.com
sgrille@girardsharp.com
fladha@girardsharp.com

*Executive Committee Counsel and Counsel for Carlos Matamoros*

## CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2026, a true and correct copy of the foregoing was filed electronically by CM/ECF, which caused notice to be sent to all counsel of record.

/s/ *Steve W. Berman*
Steve W. Berman

CONSOLIDATED CLASS ACTION COMPLAINT - 34
Case No. 2:26-cv-00788JHC



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX