The Hon. John H. Chun

# UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF WASHINGTON

# AT SEATTLE

| | |
|---|---|
| IN RE VALVE LOOT BOX LITIGATION | Case No: 2:26-cv-00788-JHC |
| | **VALVE'S MOTION TO DISMISS** |
| | NOTE ON MOTION CALENDAR: July 23, 2026 |
| | ORAL ARGUMENT REQUESTED |



1 EMBARCADERO CENTER, SUITE 1200
SAN FRANCISCO, CA 94111
(415) 868-6900

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ......................................................................................................... 1

II.   BACKGROUND .......................................................................................................... 2

   A.    Valve Creates Popular Games ......................................................................... 2

   B.    Players Use Skins to Customize Game Visuals ............................................... 3

   C.    Players Can Get Skins in Many Ways, Including from Mystery Boxes ........... 3

   D.    Skins Cannot be Sold for Money on Steam ..................................................... 4

   E.    Plaintiffs Allege Some Players Use Unaffiliated Third-Party Websites to
         Buy and Sell Skins .......................................................................................... 5

   F.    Plaintiffs Bring Claims for Alleged Violation of the Gambling Act of 1973 ....... 6

   G.    The Court, Two Arbitrators, and the Ninth Circuit Previously Resolved
         Similar Claims in Valve's Favor ..................................................................... 6

III.  ARGUMENT ................................................................................................................ 7

   A.    Plaintiffs Fail to Plausibly Allege Injury ....................................................... 7

         i.    Plaintiffs Lack Article III Standing .................................................... 7

         ii.   Plaintiffs Fail to Allege Recoverable Losses Under the RMLGA ............ 9

         iii.  Plaintiffs Lack an Injury to "Business or Property" Under the CPA ........ 9

   B.    Plaintiffs' Claims Also Fail Because They Do Not Plausibly Allege Illegal
         Gambling ......................................................................................................... 11

         i.    The Risking or Staking Element is Absent Because Players Make a
               Purchase, Not a Wager .......................................................................... 11

         ii.   The Reward Element Is Absent Because a Skin Is Not a "Thing of
               Value" ..................................................................................................... 13

               1.    A Skin is Not a Token, Object, or Article Exchangeable for
                     Money or Property .......................................................................... 13

               2.    A Skin Is Not a Form of Credit or Promise ................................... 16

               3.    A Skin Is Not a Form of Credit or Promise Contemplating
                     Transfer of an Interest in Money or Property ............................. 17

               4.    A Skin Is Not a Form of Credit or Promise that Involves
                     Extension of a Service, Entertainment, or a Privilege of
                     Playing at a Game Without Charge ............................................. 17



|  | | iii. | Plaintiffs Cannot Establish the Reward Element Because All Players Receive the Same "Value" .......................................................... 17 |
| | | iv. | Plaintiffs' Interpretation of the Gambling Laws Would Impermissibly Expand Criminal Liability Without Fair Notice ............. 20 |
| | C. | | Plaintiffs Failed to Sufficiently Plead Facts Supporting Their Theories of Deception and Unfairness Under the CPA ........................................................ 21 |
| | D. | | Plaintiffs' Unjust Enrichment Claim Fails............................................................ 22 |
| IV. | CONCLUSION | | ................................................................................................................... 22 |



**TABLE OF AUTHORITIES**

Page(s)

**CASES**

*Adell v. Macon Cnty. Greyhound Park, Inc.*,
    785 F.Supp.2d 1226 (M.D. Ala. 2011) ........................................................................... 10

*Angelilli v. Activision Blizzard, Inc.*,
    781 F.Supp.3d 691 (N.D. Ill. 2025) ............................................................................... 22

*Beychok v. Baffert*,
    No. 24-cv-00100,
    2024 WL 5112755 (W.D. Ky. Dec. 13, 2024) ................................................................ 10

*Brill v. Postle*,
    No. 19-cv-02027,
    2020 WL 2936688 (E.D. Cal. June 3, 2020) .................................................................. 10

*Brown v. Ent. Merchants Ass'n*,
    564 U.S. 786 (2011) ........................................................................................................ 21

*Cervantes v. Countrywide Home Loans, Inc.*,
    656 F.3d 1034 (9th Cir. 2011) ........................................................................................ 22

*Chaset v. Fleer/Skybox Int'l, LP*,
    300 F.3d 1083 (9th Cir. 2002) ......................................................................... 9, 12, 19, 22

*City of Seattle v. Winebrenner*,
    167 Wash.2d 451 (2009) ................................................................................................. 20

*Coffee v. Google LLC*,
    No. 20-cv-03901,
    2022 WL 94986 (N.D. Cal. Jan. 10, 2022) .......................................................... 10, 14, 20

*Courtright v. Epic Games, Inc.*,
    795 F.Supp.3d 1156 (W.D. Mo. 2025) ........................................................................... 22

*Densley v. Dep't of Ret. Sys.*,
    162 Wash.2d 210 (2007) ................................................................................................. 16

*Doug Grant, Inc. v. Greate Bay Casino Corp.*,
    232 F.3d 173 (3d Cir. 2000) ........................................................................................... 10

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ........................................................................................................ 20

*G.G. v. Valve Corp.*,
    579 F.Supp.3d 1224 (W.D. Wash. 2022) ...................................................................... 7, 8

*G.G. v. Valve Corp.*,
    799 F.App'x 557 (9th Cir. 2020) ...................................................................................... 7



*G.G. v. Valve Corp.*,
　　No. 16-cv-01941,
　　2017 WL 1210220 (W.D. Wash. Apr. 3, 2017) ................................................................. 7

*G.G. v. Valve Corp.*,
　　No. 16-cv-01941,
　　2019 WL 1354152 (W.D. Wash. Mar. 26, 2019) ............................................................. 7

*G.G. v. Valve Corp.*,
　　No. 16-cv-01941,
　　2020 WL 7385710 (W.D. Wash. Dec. 16, 2020) ............................................................. 7

*Galway v. Valve Corp.*,
　　No. 22-35105,
　　2023 WL 334012 (9th Cir. Jan. 20, 2023) ...................................................................... 7

*Garner v. Amazon.com, Inc.*,
　　603 F.Supp.3d 985 (W.D. Wash. 2022) ........................................................................... 5

*George v. NCAA*,
　　945 N.E.2d 150 (Ind. 2011) .................................................................................... 18, 19

*Hannosh v. Segal*,
　　235 Ariz. 108 (Ct. App. 2014) ..................................................................................... 10

*Hansen v. Virginia Mason Med. Ctr.*,
　　113 Wash.App. 199 (2002) ........................................................................................... 16

*Heitfeld v. Benevolent & Protective Ord. of Keglers*,
　　36 Wash.2d 685 (1950) ................................................................................................... 9

*In re Amazon Prime Video Litig.*,
　　791 F.Supp.3d 1216 (W.D. Wash. 2025) ....................................................................... 4

*Kater v. Churchill Downs Inc.*,
　　886 F.3d 784 (9th Cir. 2018) ............................................................................. 14, 15, 20

*Kitsap Cnty. v. Moore*,
　　144 Wash.2d 292 (2001) ............................................................................................... 12

*Leocal v. Ashcroft*,
　　543 U.S. 1 (2004) ......................................................................................................... 20

*Mai v. Supercell Oy*,
　　648 F.Supp.3d 1130 (N.D. Cal. 2023) ............................................................... 10, 14, 20

*Mai v. Supercell Oy*,
　　No. 23-15144,
　　2024 WL 2077500 (9th Cir. May 9, 2024) ...................................................... 8, 10, 14, 21

*Mai v. Supercell Oy*,
　　No. 20-cv-05573,
　　2021 WL 4267487 (N.D. Cal. Sept. 20, 2021) ............................................................... 8



1 Embarcadero Center, Suite 1200
San Francisco, CA 94111
(415) 868-6900

*Mason v. Mach. Zone, Inc.*,
    140 F.Supp.3d 457 (D. Md. 2015) ................................................................................... 20

*Mason v. Mach. Zone, Inc.*,
    851 F.3d 315 (4th Cir. 2017) ................................................................................. 14, 20

*McLeod v. Valve Corp.*,
    No. 16-cv-01227,
    2016 WL 5792695 (W.D. Wash. Oct. 4, 2016) ............................................................. 10

*Montes v. SPARC Grp. LLC*,
    586 P.3d 999 (Wash. 2026)....................................................................................... 10, 11

*Price v. Pinnacle Brands, Inc.*,
    138 F.3d 602 (5th Cir. 1998) ........................................................................................ 10

*Rockwell v. Chase Bank*,
    No. 10-cv-01602,
    2011 WL 2292353 (W.D. Wash. June 7, 2011)............................................................. 21

*Rodriguez v. Topps Co.*,
    104 F.Supp.2d 1224 (S.D. Cal. 2000)........................................................................... 10

*Soto v. Sky Union, LLC*,
    159 F.Supp.3d 871 (N.D. Ill. 2016) ......................................................................... 14, 20

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)................................................................................................... 7, 8

*State v. Enloe*,
    47 Wash.App. 165 (1987)............................................................................................. 20

*State v. Williams*,
    144 Wash.2d 197 (2001)............................................................................................... 20

*Stone v. Chelan Cnty. Sheriff's Dep't*,
    110 Wash.2d 806 (1988)........................................................................................... 14, 16

*Taylor v. Apple, Inc.*,
    No. 20-cv-03906,
    2022 WL 35601 (N.D. Cal. Jan. 4, 2022)................................................................. 10, 20

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021).................................................................................................... 8

*United States v. Approximately 64,695 Pounds of Shark Fins*,
    520 F.3d 976 (9th Cir. 2008) ........................................................................................ 20

*United States v. Jimenez*,
    191 F.Supp.3d 1038 (N.D. Cal. 2016) .......................................................................... 20

*Young v. Young*,
    164 Wash.2d 477 (2008)............................................................................................... 22



*Zulily, LLC v. Amazon.com, Inc.*,
        761 F.Supp.3d 1368 (W.D. Wash. 2024)..........................................................................21

**STATUTES**

18 U.S.C. § 1964................................................................................................................9

Cal. Bus. & Prof. Code § 17204 .....................................................................................10

RCW 4.24.070 ...................................................................................................................9

RCW 9.46.0237 ..........................................................................................................11, 18

RCW 9.46.0285 .....................................................................................................13, 16, 17

RCW 19.134.010 ..............................................................................................................16

RCW 19.230.010 ..............................................................................................................13

RCW 19.86.090 ..................................................................................................................9

RCW 62A.1-201 ...............................................................................................................13

**REGULATIONS**

12 C.F.R. § 1002.2 ...........................................................................................................16



1 EMBARCADERO CENTER, SUITE 1200
SAN FRANCISCO, CA 94111
(415) 868-6900

## I.    <u>INTRODUCTION</u>

Everyone who buys a pack of baseball or Pokémon cards, a LEGO blind box, or a subscription box with random selections, strikes the same bargain: I don't know exactly what is inside this mystery box, but I know the possibilities and I agree to take what I find. Some are collectors looking to fill out a set. Others want a new Pokémon card to use in a game, new LEGO figures to build with, or fun new clothing to wear. Some are looking for rare cards or items, while others want items to trade with friends. All agree to accept whatever is in the mystery box.

What Plaintiffs call "loot boxes" are the online equivalent of these real-world items—virtual mystery boxes that always give players a cosmetic virtual item from a known set, but without players knowing the exact item they will receive before opening. And just like these real-world examples, Valve's virtual mystery boxes are neither gambling nor illegal. Plaintiffs plead nothing different or unique about these mystery boxes that would extend gambling and consumer protection laws to them when such laws have never been extended to cover their real-world analogs. The cosmetic items in the mystery boxes at issue in this case, referred to here as "skins," are designed and widely used to customize the appearance of in-game characters. Skins can also be collected, traded with friends, or sold to other players on the Steam Community Market for virtual "Steam Wallet funds" that can be used on Steam but never converted to cash. Skins are optional; they are not needed to play the game and do not affect or extend gameplay. Plaintiffs do not state a claim as a matter of law.

First, Plaintiffs fail to allege a qualifying injury under Article III or the statutes governing their claims. Plaintiffs have not even alleged their outcome from opening any mystery box, much less injury from that outcome. Nor could they because each received the benefit of their bargain: a mystery box that provides exactly one skin when opened. Plaintiffs at most can only allege disappointed expectations, which is not a cognizable injury.

Second, Plaintiffs' claims also fail because mystery boxes do not violate gambling laws. Gambling laws require a "stake or risk" of "something of value" on a game of chance where "something of value" is received only "in the event of a certain outcome."



There is no "stake or risk" or receipt "in the event of a certain outcome" with mystery boxes because players are guaranteed to get a skin every time they open one. That skin may or may not be one a player hoped for, but subjective expectations do not convert an ordinary commercial transaction into a wager. Nor does the ability of a player to later resell a skin for more or less than they paid to open the mystery box make that payment a stake or risk.

Also, while players enjoy using, collecting, and trading skins, they are not "something of value" under the legal definition in Washington's gambling statute. That definition is limited to financial instruments like money, property, and cash equivalents, or casino chips that can be used to continue gambling or redeemed directly for cash. A skin is an in-game cosmetic item, not a financial instrument. Stretching "something of value" to cover skins would render it so broad as to be meaningless, violate the rule of lenity, and not give fair notice to Valve. And even if a skin were "something of value," it would be measured by the fixed amount players pay Valve to open a mystery box and not a potential resale price in a later hypothetical transaction between users (Valve does not repurchase skins or set resale prices). Thus, there is no chance-based reward.

Third, Plaintiffs' CPA claims are conclusory and fail to state a claim. Plaintiffs' CPA claim is largely premised on alleging mystery boxes are illegal gambling; it fails because they are not. Plaintiffs do not allege that they were deceived, did not get what they purchased, or that they personally suffered any injury. Accepting Plaintiffs' conclusory allegations would also premise liability on expressive game design, which is protected under the First Amendment. Such claims cannot be the basis of liability.

Plaintiffs concede they got exactly what they paid for: cosmetic virtual items from known sets that are usable in Valve's games. The Court should dismiss the Complaint with prejudice because no amendment can cure these fundamental defects in Plaintiffs' claims.

## II.    BACKGROUND

### A.    Valve Creates Popular Games

Valve is a video game company. *See* Dkt. No. 23 (Compl.) ¶¶ 1, 23. Three of Valve's most popular video game franchises, Counter-Strike, Dota, and Team Fortress (collectively, the "Relevant Games"), are competitive, free-to-play multiplayer games that have attracted millions

Tyz Law Group

1 EMBARCADERO CENTER, SUITE 1200
SAN FRANCISCO, CA 94111
(415) 868-6900

of players for well over a decade. *See* Compl. ¶¶ 25–27. Communities of enthusiastic players have developed around them, including tournaments and content creators who stream gameplay online. *Id.*

### B.    Players Use Skins to Customize Game Visuals

The Relevant Games offer cosmetic virtual items players can use to customize their characters' appearance. Those cosmetic items are referred to here as "skins." Skins are purely cosmetic and have no effect on how the game is played. *Id.* ¶ 29. For example, a skin might change the appearance of a player's in-game weapon by altering its color or texture. *Id.*

### C.    Players Can Get Skins in Many Ways, Including from Mystery Boxes

Players do not need skins to play the Relevant Games, but players who like skins can get them in several ways, including as gifts, through random drops, by trading, or by buying them from others on the Steam Community Market using virtual Steam Wallet funds. *See id.* ¶¶ 34, 42, 45.

Players can also choose to get skins by opening virtual "mystery boxes," which Plaintiffs call "loot boxes." *See id.* ¶¶ 2, 30. Each mystery box contains one skin from a small collection of about a dozen possibilities. *Id.* ¶¶ 2, 32; *see also id.* ¶ 36. Before opening a mystery box, players can see which skins it may contain and how rare each one is. *Id.* ¶ 32. For example, the "Dreams & Nightmares" Counter-Strike mystery box contains one of the skins in the disclosed list shown below, with color indicating rarity:

Tyz Law Group

1 EMBARCADERO CENTER, SUITE 1200
SAN FRANCISCO, CA 94111
(415) 868-6900



*See* Compl. ¶ 32, Fig. 5.

When a player opens a mystery box, they always get exactly one of the skins from the disclosed set. Compl. ¶ 32. Players who choose to open a mystery box typically pay $2.49 in Steam Wallet funds to do so, either by purchasing a virtual "key" or paying directly to open the box. *See id.* ¶ 31.

**D.      Skins Cannot be Sold for Money on Steam**

To play the Relevant Games, players must first create an account on Steam, which is Valve's online platform where players can buy and play games. Compl. ¶¶ 23, 60. Such players must agree to the Steam Subscriber Agreement (SSA). *Id.*; *see* Apple Decl., Ex. 1 (SSA).[1]

Each Steam account has a Steam Wallet, which holds virtual funds. Compl. ¶ 24; SSA § 3.C. Steam Wallet funds are only usable for purchases on Steam and are not a personal property right. SSA § 3.C. Steam users agree Steam Wallet funds "have no cash value and are not exchangeable for cash." SSA § 3.C.

---

[1] The Court may consider the SSA on a motion to dismiss because Plaintiffs' Complaint incorporates it by reference. *See In re Amazon Prime Video Litig.*, 791 F.Supp.3d 1216, 1220 n.2 (W.D. Wash. 2025); Compl. ¶¶ 6, 11 n.4, 22, 46, 60–62, 102 (Plaintiffs relying on SSA for venue, application of Washington law, and to allege unfairness).

Tyz Law Group
1 EMBARCADERO CENTER, SUITE 1200
SAN FRANCISCO, CA 94111
(415) 868-6900

Players can open mystery boxes and buy and sell virtual items (including skins) on the Steam Community Market using Steam Wallet funds only—not real money. *See* SSA § 3.C; Compl. ¶ 24. Players can also trade virtual items from one Steam account to another through the Steam Trading feature without charge. *See* SSA § 3.D; Apple Decl., Ex. 3.[2] Players cannot "sell, charge others for the right to use, or transfer" virtual items "other than if and as expressly permitted." SSA § 1.C. Valve does not recognize transfers of virtual items made outside of Steam. SSA § 3.D.

### E.    Plaintiffs Allege Some Players Use Unaffiliated Third-Party Websites to Buy and Sell Skins

The Relevant Games are played through Steam and skins never leave users' Steam accounts. Yet many of Plaintiffs' allegations focus on activity outside of Steam done by people other than Valve. Plaintiffs allege there are third-party websites where players can make deals to buy or sell skins for real money. Compl. ¶ 45. Plaintiffs do not allege that Valve owns, operates, or controls these third-party websites, or that Valve receives any revenue from them or these alleged sales.

Plaintiffs instead allege Valve is responsible for third parties' actions *outside of Steam* because its Steam Trading feature allows users to trade skins *on Steam* between Steam accounts. Plaintiffs focus on a "Trade URL" Steam users can use to initiate trades using Steam Trading with other Steam users. Compl. ¶ 45 & Fig. 14. These trade offers simply invite users to exchange virtual items on Steam; they cannot include Steam Wallet funds or any real money. Apple Decl., Ex. 2. Plaintiffs speculate users might arrange on a third-party website to use Steam Trading to move a skin from one Steam account to another in exchange for a real-money payment made outside of Steam and brokered by the third-party website. *See* Compl. ¶¶ 45–46. Valve has no role in brokering such transactions *outside of Steam* and receives no money from them, but Plaintiffs allege *Valve* is nonetheless responsible because the Steam Trading feature allows users

---

[2] The Court can consider the FAQs in Exhibits 2 and 3 to the Apple Declaration on a motion to dismiss because Plaintiffs reference and excerpt portions of the same website to support their claims. *See* Apple Decl. ¶¶ 4–6; Compl. ¶ 45, Fig. 14; *Garner v. Amazon.com, Inc.*, 603 F.Supp.3d 985, 992 (W.D. Wash. 2022) (taking judicial notice of FAQs).

Tyz Law Group
1 EMBARCADERO CENTER, SUITE 1200
SAN FRANCISCO, CA 94111
(415) 868-6900

to trade skins *on Steam* between Steam accounts. Compl. ¶ 45. Importantly, Plaintiffs do not allege they ever sold skins in deals brokered on third-party websites or even that they traded skins on Steam; they instead speculate that "presumably, the payment for the item is made on the third-party trading site" without factual basis. *See* Compl. ¶ 45.

### F.    Plaintiffs Bring Claims for Alleged Violation of the Gambling Act of 1973

Plaintiffs bring three causes of action: (1) Washington's Recovery of Money Lost at Gambling Act (RMLGA), RCW 4.24.070; (2) the Washington Consumer Protection Act (CPA), RCW 19.86.010 et seq.; and (3) unjust enrichment. Compl. ¶¶ 84–109.

Plaintiffs' claims are premised on alleging mystery box openings are illegal "gambling" under the Gambling Act of 1973. Compl. ¶¶ 5, 71, 78, 87, 99. Plaintiffs do not plead what they received from opening mystery boxes. Plaintiffs never claim they received nothing at all, nor allege the skins they received were anything other than what they were represented to be. Instead, Plaintiffs rely solely on their purchase of keys to allege injury. *See* Compl. ¶¶ 12–17.

Plaintiffs assert skins are things of value under the Gambling Act because players can sell them for Steam Wallet funds on the Steam Community Market or for real money through deals arranged on unaffiliated third-party websites outside of Steam. Compl. ¶¶ 42–47. Plaintiffs do not allege that they ever sold a skin or were even aware of these third-party websites.

Plaintiffs also claim mystery boxes are unfair or deceptive under the CPA because Valve supposedly exploits "psychological mechanisms," lacks age verification (despite no Plaintiffs being minors and no law requiring age verification), inconsistently enforces the SSA against third-party websites outside of Steam, and fails to disclose odds. Compl. ¶ 102; *see id.* ¶¶ 6, 8, 32, 46, 48–55, 68. But Plaintiffs do not allege any facts tying these theories to their own purchases, let alone any injury.

### G.    The Court, Two Arbitrators, and the Ninth Circuit Previously Resolved Similar Claims in Valve's Favor

Similar claims were already brought against Valve and resolved in Valve's favor after being litigated in this Court, two arbitrations, and the Ninth Circuit (twice). In 2016, parents and their minor children brought a putative class action against Valve alleging Valve violated

Washington gambling laws and the CPA by offering mystery boxes containing skins in the Relevant Games. *See G.G. v. Valve Corp.*, No. 16-cv-01941, 2017 WL 1210220, at *1 (W.D. Wash. Apr. 3, 2017). Judge Coughenour initially compelled the claims to arbitration. *Id.* at *5. Valve won the arbitrations on their merits after full evidentiary hearings. *See G.G. v. Valve Corp.*, No. 16-cv-01941, 2019 WL 1354152, at *1 (W.D. Wash. Mar. 26, 2019). The Ninth Circuit vacated the portion of the decisions compelling the parents to arbitrate their individual claims. *G.G. v. Valve Corp.*, 799 F.App'x 557, 558 (9th Cir. 2020). On remand, Judge Robart dismissed most of the parents' claims under Rule 12(b)(6). *G.G. v. Valve Corp.*, No. 16-cv-01941, 2020 WL 7385710, at *10–11 (W.D. Wash. Dec. 16, 2020). The Court later granted summary judgment in Valve's favor on the sole remaining CPA claim, which was affirmed by the Ninth Circuit. *G.G. v. Valve Corp.*, 579 F.Supp.3d 1224, 1234–35 (W.D. Wash. 2022), *aff'd sub nom. Galway v. Valve Corp.*, No. 22-35105, 2023 WL 334012, at *1–2 (9th Cir. Jan. 20, 2023). Plaintiffs' claims here are an attempt to relitigate these same issues.

## III.    ARGUMENT

### A.    Plaintiffs Fail to Plausibly Allege Injury

Plaintiffs lack Article III standing and fail to allege plausible statutory injury required by their claims. Plaintiffs' only alleged harm was that they "lost money by purchasing keys." *See* Compl. ¶¶ 12–17. This fails to allege injury—although Plaintiffs allege skins may be resold for more or less than the value of a key, they fail to allege any outcome from opening a mystery box. *See* Compl. ¶ 33. Moreover, Plaintiffs acknowledge players who open a mystery box receive the benefit of their bargain because they always get a skin from a disclosed list. *See* Compl. ¶¶ 2, 32, 36. Whatever subjective disappointment Plaintiffs may have experienced is not an injury-in-fact under Article III, a net loss from an illegal gambling game under the RMLGA, or an injury to business or property under the CPA. The Court should therefore dismiss Plaintiffs' claims.

#### i.    Plaintiffs Lack Article III Standing

Article III standing requires alleging a concrete injury in fact. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337–40 (2016). Plaintiffs do not automatically satisfy the injury-in-fact requirement by alleging violation of a statute because "Article III standing requires a concrete injury even in the

VALVE'S MOT. TO DISMISS
CASE NO. 2:26-CV-00788-JHC                              - 7 -

🇹 Tyz Law Group™
1 EMBARCADERO CENTER, SUITE 1200
SAN FRANCISCO, CA 94111
(415) 868-6900

context of a statutory violation." *Id.* at 341; *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 426 (2021). As discussed below, Plaintiffs have not plausibly alleged any violation of the gambling laws. *See infra*, Section III.B. But they would still lack Article III standing even if they had.

In *Mai v. Supercell Oy*, the Ninth Circuit held that plaintiffs alleging gambling claims based on opening mystery boxes lack Article III standing. No. 23-15144, 2024 WL 2077500 (9th Cir. May 9, 2024). The plaintiffs in *Mai* alleged injury based on money spent on mystery boxes, but "concede[d] that for each loot box they purchased, they received exactly what they expected: at least one mystery virtual item." *Id.*, at *1. Applying *Spokeo*, the Ninth Circuit held plaintiffs had not suffered injury-in-fact even assuming mystery boxes are illegal because plaintiffs received the benefit of the bargain by getting at least one mystery virtual item. *Id.* Plaintiffs here lack Article III standing for the same reasons.

Plaintiffs also lack standing to bring claims relating to two of the three Relevant Games: Team Fortress 2 and Dota 2. Plaintiffs each allege purchasing keys exclusively for mystery boxes for Counter-Strike, not for Team Fortress 2 or Dota 2. *See* Compl. ¶¶ 12–17. In a prior class action against Valve, Judge Robart held the plaintiffs could not pursue similar claims of gambling in Dota 2 and Team Fortress 2 when their alleged injury was only related to Counter-Strike mystery boxes and skins. *See G.G. v. Valve Corp.*, 579 F.Supp.3d 1224, 1232 (W.D. Wash. 2022) (plaintiffs could not establish injury to their business or property caused by Dota 2 and Team Fortress 2 because they had no experience with those games). Other courts have similarly held plaintiffs lack standing to assert claims based on mystery boxes they did not purchase or open. *See Mai v. Supercell Oy*, No. 20-cv-05573, 2021 WL 4267487, at *3 (N.D. Cal. Sept. 20, 2021) (dismissing claims in proposed class action relating to game plaintiff did not allege experiencing), *rev'd on other grounds*, 2024 WL 2077500; *see also TransUnion*, 594 U.S. at 431 ("[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek."). The same conclusion follows here.



1 EMBARCADERO CENTER, SUITE 1200
SAN FRANCISCO, CA 94111
(415) 868-6900

ii.    Plaintiffs Fail to Allege Recoverable Losses Under the RMLGA

Plaintiffs also fail to state a claim under the RMLGA, which requires "losing money or anything of value at or on any illegal gambling games." RCW 4.24.070. A loss under the RMLGA means a *net* loss, not merely a payment made in anticipation of playing a game. *See Heitfeld v. Benevolent & Protective Ord. of Keglers*, 36 Wash.2d 685, 696 (1950) (RMLGA damages "offset for any money won").

Plaintiffs have not alleged a recoverable loss because they allege only that they "lost money by purchasing keys." *See* Compl. ¶¶ 12–17. But money spent to buy keys is not a loss *at or on* a gambling game, as the RMGLA requires. Nor do Plaintiffs allege net loss because they allege nothing about the outcome of opening a mystery box. The Court should therefore dismiss Plaintiffs' RMLGA claims.

iii.    Plaintiffs Lack an Injury to "Business or Property" Under the CPA

Plaintiffs also fail to state a claim under the CPA, which provides a claim only to those "injured in his or her business or property." RCW 19.86.090. Plaintiffs' alleging they lost money by purchasing keys (Compl. ¶¶ 12–17) is insufficient for the same reasons as above—buying a key is just a purchase, not a loss. Plaintiffs also do not allege they were deprived of the benefit of the bargain they knowingly struck: to receive a skin from a known set.

Plaintiffs' CPA claim is also defective because their alleged "loss" is not injury to "business or property," as the Ninth Circuit recognized in applying the analogous RICO standing requirement. *See Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083, 1087 (9th Cir. 2002); 18 U.S.C. § 1964(c). In *Chaset*, the Ninth Circuit held a buyer of baseball trading-card packs with a chance of containing a valuable insert card did not suffer an injury to business or property because "[t]he chance is real, and having paid for it and received it, the card purchaser has not suffered any financial loss." *Chaset*, 300 F.3d at 1087. Any "disappointment" at not obtaining an insert card was not an injury to property. *Id.* That a purchaser of such card packs could later trade or sell the cards they got—even if for less than the cost of the pack—did not establish an injury either. *See id.* at 1086–87.



This Court applied the reasoning in *Chaset* to dismiss a RICO claim against Valve predicated on similar alleged gambling violations. *See McLeod v. Valve Corp.*, No. 16-cv-01227, 2016 WL 5792695, at *2 (W.D. Wash. Oct. 4, 2016) ("[T]he case law in the Ninth Circuit is clear: gambling losses are not sufficient injury to business or property for RICO standing."). Other courts consistently held that alleged gambling losses are not an injury to business or property. *See, e.g.*, *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 188 (3d Cir. 2000); *Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 607 (5th Cir. 1998); *Brill v. Postle*, No. 19-cv-02027, 2020 WL 2936688, at *9 (E.D. Cal. June 3, 2020); *Rodriguez v. Topps Co.*, 104 F.Supp.2d 1224, 1226–27 (S.D. Cal. 2000); *Beychok v. Baffert*, No. 24-cv-00100, 2024 WL 5112755, at *15 (W.D. Ky. Dec. 13, 2024); *Adell v. Macon Cnty. Greyhound Park, Inc.*, 785 F.Supp.2d 1226, 1241 (M.D. Ala. 2011); *Hannosh v. Segal*, 235 Ariz. 108, 112 (Ct. App. 2014).

Courts routinely apply the same analysis to dismiss consumer protection claims applying gambling laws to mystery boxes. For example, the court in *Mai* dismissed claims under California's Unfair Competition Law alleging mystery boxes are gambling because plaintiffs could not show they "lost money or property," as the statute requires. *See* 648 F.Supp.3d 1130, 1134 (N.D. Cal. 2023), *rev'd*, 2024 WL 2077500, at *1 n.1 (agreeing plaintiffs lacked statutory standing and lacked Article III standing too); *see also* Cal. Bus. & Prof. Code § 17204. The court reasoned that plaintiffs who bought a mystery box and received exactly what they expected—a virtual item—got the benefit of the bargain they struck and therefore lacked standing. *Mai*, 648 F.Supp.3d at 1134–35. Other courts have dismissed claims that mystery boxes are gambling on the same grounds. *See Coffee v. Google LLC*, No. 20-cv-03901, 2022 WL 94986, at *9 (N.D. Cal. Jan. 10, 2022); *Taylor v. Apple, Inc.*, No. 20-cv-03906, 2022 WL 35601, at *2 (N.D. Cal. Jan. 4, 2022).

Plaintiffs cannot show an injury to business or property under Washington's CPA for the same reason. The Washington Supreme Court's recent *en banc* decision in *Montes v. SPARC Grp. LLC*, 586 P.3d 999 (Wash. 2026), illustrates why. The plaintiff in *Montes* bought $6 leggings after seeing a struck-out "regular price" of $12.50, which the defendant rarely charged. *Id.* at 1002–03. The Court held the plaintiff did not establish a CPA injury because she received exactly

Tyz Law Group

1 EMBARCADERO CENTER, SUITE 1200
SAN FRANCISCO, CA 94111
(415) 868-6900

what she bargained for—a product at the advertised price—even if she thought she was saving more than she did. *Id.* at 1008. Although a consumer could allege cognizable injury by getting a product "objectively different from or less valuable than the product she thought she was buying," the plaintiff in *Montes* made no such allegation. *Id.* at 1006. Instead, the injury she alleged was "more accurately characterized as dashed expectations," and "disappointment is not a cognizable CPA injury." *Id.* at 1005–06, 1008.

Here, Plaintiffs have not alleged they were deprived of the benefit of their bargain, nor can they. This is no different than the cases dismissing claims alleging gambling losses under analogous statutory standing requirements in RICO and California's UCL. And under Washington law, Plaintiffs' CPA claim fails because it relies on subjective disappointment despite receiving the full benefit of the bargain. *See Montes*, 586 P.3d at 1006.

**B.      Plaintiffs' Claims Also Fail Because They Do Not Plausibly Allege Illegal Gambling**

Even if Plaintiffs had standing, they fail to plausibly allege mystery box openings are illegal gambling, which is the core of each asserted claim. Compl. ¶¶ 84–109. Washington's gambling statute requires three distinct elements: (1) staking or risking something of value, (2) upon the outcome of a contest of chance, and (3) an agreement or understanding the person or someone else will receive something of value in the event of a certain outcome (*i.e.*, a reward). RCW 9.46.0237. Plaintiffs fail to allege facts plausibly showing each of these elements.

i.      <u>The Risking or Staking Element is Absent Because Players Make a Purchase, Not a Wager</u>

Plaintiffs' gambling claims fail because they do not plausibly allege the requisite stake or risk. Washington's gambling statute requires "staking or risking something of value upon the outcome of a contest of chance." RCW 9.46.0237. Plaintiffs claim spending $2.49 to buy a key to open a mystery box is a stake or risk. *See* Compl. ¶ 5, 88. But as Plaintiffs acknowledge, every player who buys a key and opens a mystery box receives exactly one skin from a small, disclosed set. *See* Compl. ¶¶ 2, 32, 36. This describes an ordinary commercial purchase, not a stake or risk where either the player or the house wins.

Tyz Law Group
1 EMBARCADERO CENTER, SUITE 1200
SAN FRANCISCO, CA 94111
(415) 868-6900

Holding this transaction to be a stake or risk just because chance is involved in the aesthetics of the skin received would criminalize vast swaths of retail commerce, including:

- Baseball, Pokémon, and *Magic: The Gathering* card packs;

- Physical blind boxes like Labubus or randomized LEGO packs;

- Comic book store grab bags;

- Fashion or book box subscriptions with randomized selections; and

- Arcades where customers purchase tokens to play games of chance to win tickets redeemable for prizes.

Unsurprisingly, courts have rejected such broad interpretations. *See, e.g.*, *Chaset*, 300 F.3d at 1087 (rejecting gambling claim targeting trading card packs because purchasers receive the cards they pay for, even if cards in a pack are randomized). This Court should likewise reject it, particularly considering the many unintended consequences such a broad interpretation would create. *See Kitsap Cnty. v. Moore*, 144 Wash.2d 292, 297 (2001) (Washington courts avoid statutory interpretations that "would result in unlikely, absurd or strained consequences.").

Plaintiffs' allegation that some skins might later be resold for more than others (just like baseball cards might) also fails to show the money paid to open a mystery box is a risk or stake. The gambling statute requires a stake be placed "upon the outcome" of a game of chance, not upon whatever a player may choose to do with a skin *after* getting it. *See Chaset*, 300 F.3d at 1086–87 (9th Cir. 2002) (value of baseball card packs determined at "the time the plaintiffs purchased" them, not when resold). The statute does not support using a player's ability to later resell a skin—a speculative transaction entirely separate from opening a mystery box—to recharacterize a purchase as an illegal wager.[3]

Just like baseball cards, what players choose to do with a skin is subjective and personal. Players may use it in-game, add it to a collection, trade it to a friend, or sell it to other users on the Steam Community Market for virtual Steam Wallet funds. Every retail purchase carries a "risk" an item is resalable for less than the initial purchase price; this does not retroactively

---

[3] Notably, Plaintiffs' theory would retroactively convert a sale into an illegal wager whether a resold skin was obtained from a mystery box, as a gift, or for free in-game.

Tyz Law Group
1 EMBARCADERO CENTER, SUITE 1200
SAN FRANCISCO, CA 94111
(415) 868-6900

transform the purchase into an illegal wager. Importantly, Valve does not repurchase skins or control resale prices. Thus, the Court should dismiss Plaintiffs' claims for failing to plausibly allege a risk or stake.

ii.    The Reward Element Is Absent Because a Skin Is Not a "Thing of Value"

Plaintiffs assert skins received from mystery boxes are "things of value" under Washington gambling laws. But "thing of value" is limited to mean:

> [1] any money or property, [2] any token, object or article exchangeable for money or property, or [3] any form of credit or promise, [3a] directly or indirectly, contemplating transfer of money or property or of any interest therein, or [3b] involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge.

RCW 9.46.0285 (numbering added). Plaintiffs never allege a skin itself is money or property. Instead, they claim a skin is something of value because allegedly it (1) can be exchanged for money or property, (2) is a credit involving the extension of entertainment and a privilege of playing a game without charge, and (3) is a token or article exchangeable for money or property. Compl. ¶ 92. None of these theories pass scrutiny.

1.    *A Skin is Not a Token, Object, or Article Exchangeable for Money or Property*

Plaintiffs claim skins are "exchangeable for money or property" because players allegedly can: (1) sell a skin for Steam Wallet funds through the Steam Community Market (Compl. ¶¶ 42–44), (2) buy and sell skins on unaffiliated third-party websites (*id.* ¶¶ 45–47), and (3) sell a skin for Steam Wallet funds, use those funds to buy Valve hardware on Steam, and then sell that hardware to a third party for money (*id.* ¶ 43). None of these allegations show *skins* are "exchangeable for money or property" under Washington's gambling laws.

First, Plaintiffs' reliance on selling skins for Steam Wallet funds fails because those virtual funds are not real-world money and cannot be used outside of Steam. *See* RCW 62A.1-201(24) (U.C.C. defining money as a medium of exchange authorized by a government and excluding unauthorized virtual currency); RCW 19.230.010(16), (30) (same under Uniform Money Services Act). Further, the SSA makes clear Steam Wallet funds are "non-refundable and non-

transferable," "have no cash value and are not exchangeable for cash," and "do not constitute a personal property right." *See* SSA § 3.C. The Court should therefore reject Plaintiffs' theory.

Second, Plaintiffs' allegation that players can sell skins on third-party websites unaffiliated with Valve also fails to show skins are "exchangeable for money or property." Every Steam user must agree to the SSA, which (1) prohibits users from selling, transferring, or commercially exploiting skins outside of Steam, and (2) provides that Valve does not recognize any transfers of virtual items made outside Steam. *See* SSA §§ 1.C (prohibiting selling or transferring unless authorized by Valve), 2.G (restricting use to "personal, non-commercial use" and disallowing selling without Valve's prior written consent), 3.D (Valve does not recognize transfers made outside of Steam); *see also* Compl. ¶¶ 6, 46, 102. Courts have uniformly rejected the argument that virtual items are something of value based on unsanctioned activity on a third-party website. *See, e.g.*, *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 787–88 & n.2 (9th Cir. 2018) (virtual chips not a "thing of value" based on third-party resale market because user terms prohibited such resale); *Mason v. Mach. Zone, Inc.*, 851 F.3d 315, 320 n.3 (4th Cir. 2017); *Mai*, 648 F.Supp.3d at 1137, *rev'd on other grounds*, 2024 WL 2077500; *Coffee*, 2022 WL 94986, at *13.

Instead, courts have interpreted "exchangeable" under analogous statutes to require the game operator to participate in the money exchange. For example, the court in *Soto v. Sky Union, LLC* found the "imaginary rewards" in mystery boxes were not things of value because they were not exchangeable with the game operator. 159 F.Supp.3d 871, 879–80 (N.D. Ill. 2016) (noting that "a player who purchases tokens at a casino cashes them out by exchanging them for money at the casino itself"). If "exchangeable for money or property" were read to encompass any item that could theoretically be sold to an independent third party, the definition would have no limiting principle because almost everything can be resold. A statutory definition that reaches everything defines nothing. The Court should reject Plaintiffs' novel and expansive theory because it would render the definition of "thing of value" meaningless. *See Stone v. Chelan Cnty. Sheriff's Dep't*, 110 Wash.2d 806, 810 (1988).

VALVE'S MOT. TO DISMISS
CASE NO. 2:26-CV-00788-JHC                                  - 14 -

Tyz Law Group
1 EMBARCADERO CENTER, SUITE 1200
SAN FRANCISCO, CA 94111
(415) 868-6900

Plaintiffs' argument that Valve authorized or facilitated selling skins for money on third-party websites—by offering a trading feature and allegedly not enforcing Steam's terms of use against third-party websites aggressively enough—is irrelevant and implausible. It is irrelevant because *Kater* found that a virtual item cannot be a thing of value based on a prohibited use. 886 F.3d at 788 n.2. Further, Valve's terms apply only on Steam. Valve is not aware of any requirement to try to enforce its terms against third-party websites or any authority holding that failure to vigorously police third-party conduct transforms a lawful product or feature (*e.g.*, Steam Trading) into an illegal gambling operation.

Plaintiffs' conclusory argument that Valve's "Trade URL" feature shows Valve intentionally facilitates purchases on unaffiliated third-party websites is also implausible. A Trade URL is simply a way for players to begin an exchange of virtual items on Steam using Steam Trading. It does not allow players to sell skins for virtual funds or cash. *See* Apple Decl., Ex. 2 at 2, Ex. 3 at 5 ("You cannot add Wallet credit, PayPal, gift cards or any form of money into the trade offer."). Plaintiffs do not allege otherwise. Instead, Plaintiffs speculate that "presumably, the payment for the item is made on the third-party trading site." Compl. ¶ 45. Importantly, Plaintiffs never allege they engaged in such transactions on third-party websites or even that they have personal knowledge of them. The mere possibility of such use—without any participation by Valve—does not plausibly establish that Valve "authorized" or "facilitated" selling skins for money on third-party websites.

Nor does Plaintiffs' allegation that Valve has not enforced Steam's terms of use against third-party websites aggressively enough make Plaintiffs' claims plausible. Plaintiffs' speculative allegations are pleaded entirely on "information and belief." Compl. ¶ 46. Moreover, Plaintiffs plead no plausible way for Valve to somehow shut down an unaffiliated third-party website, particularly by "enforcing" terms that only apply to use of Steam.

Third, Plaintiffs' similarly implausible alternative theory is that skins are "something of value" based on a multi-part transaction in which a player (1) gets a skin, (2) sells it on the Steam Community Market for virtual Steam Wallet funds, (3) buys hardware on Steam with those funds, and then (4) sells that hardware to a third party outside of Steam. This attenuated theory fails for

Tyz Law Group
1 EMBARCADERO CENTER, SUITE 1200
SAN FRANCISCO, CA 94111
(415) 868-6900

the reasons above regarding transactions on third-party websites and because the statutory definition of "thing of value" requires that a token, object, or article be *directly exchangeable* for money or property, not eventually convertible to money through a multi-part transaction. The statutory definition distinguishes a "token, object or article exchangeable for money or property" in the second prong from a "form of credit or promise, *directly or indirectly*, contemplating transfer of money or property" in the third prong. RCW 9.46.0285 (emphasis added). The Court should presume this omission of "directly or indirectly" from the second prong was intentional and shows Legislative intent to cover only direct exchangeability. *See Densley v. Dep't of Ret. Sys.*, 162 Wash.2d 210, 219 (2007) ("When the legislature uses two different terms in the same statute, courts presume the legislature intends the terms to have different meanings."). Further, the Court should not read "directly or indirectly" into the "token, object or article" provision because doing so would render the use of "directly or indirectly" in the third prong superfluous. *See Stone*, 110 Wash.2d at 810. Thus, Plaintiffs' multi-part transaction theory does not render a skin something of value under the gambling laws either.

### 2. *A Skin Is Not a Form of Credit or Promise*

A skin is also not a "thing of value" under the third prong because it is not a "form of credit or promise," much less one that meets the other requirements of the definition. *See* RCW 9.46.0285. A "credit" is a right granted by a creditor to defer payment or incur debt. *See, e.g.*, 12 C.F.R. § 1002.2(j); *see also* RCW 19.134.010(7). A "promise" is a manifestation of intention to act or refrain from acting in a certain way in the future. *See, e.g.*, *Hansen v. Virginia Mason Med. Ctr.*, 113 Wash.App. 199, 207 (2002).

A skin is not a "credit or promise." A skin does not give anyone the right to defer a payment or incur debt. Nor is a skin a promise to do anything, much less to pay money. For example, Valve does not repurchase skins from users or set resale prices, nor has it committed to transfer money or property in exchange for a skin. Plaintiffs have not alleged facts showing a skin is a credit or promise, and the plain meanings of those terms do not apply to a skin.

VALVE'S MOT. TO DISMISS
CASE NO. 2:26-CV-00788-JHC                           - 16 -

Tyz Law Group
1 EMBARCADERO CENTER, SUITE 1200
SAN FRANCISCO, CA 94111
(415) 868-6900

3.    *A Skin Is Not a Form of Credit or Promise Contemplating Transfer of an Interest in Money or Property*

Nor is a skin a credit or promise "contemplating" transfer of an interest in money or property. *See* RCW 9.46.0285. To the contrary, the only "contemplation" is of an exchange of a skin for something that is *not* money or property (another skin or virtual Steam Wallet funds). *See supra*, Section III.B.ii.1. And even then, players have no contractual right to exchange or sell a skin at all. *See* SSA at 3.D ("Valve does not have any obligation to provide or maintain any Subscription Marketplace."). Thus, a skin is not a credit or promise contemplating transfer of an interest in money or property.

4.    *A Skin Is Not a Form of Credit or Promise that Involves Extension of a Service, Entertainment, or a Privilege of Playing at a Game Without Charge*

Skins also do not involve extending a service, entertainment, or a privilege of playing at a game without charge. This prong reaches only credits or promises that *extend* play, like casino chips won from a slot machine that can be put back into the machine to enable further play. Skins do not work that way. They cannot be used to open mystery boxes and they have no effect on gameplay. *See* Compl. ¶¶ 4 & n.3, 28, 31.

Plaintiffs' speculation that a skin can be sold on the Steam Community Market for Steam Wallet funds, which can then be used to purchase more mystery boxes and keys to open them, also relies on a multi-part transaction. These independent transactions do not show that a *skin*— the item received from opening a mystery box—itself extends entertainment or playing a game without charge. Under Plaintiffs' theory, anything received in any transaction that is capable of being sold would extend the privilege of playing, which would render this prong boundless and eliminate any distinction between extending a game and winning "money or property" under the first prong.

iii.    Plaintiffs Cannot Establish the Reward Element Because All Players Receive the Same "Value"

Plaintiffs fail to plausibly allege mystery box openings establish the reward element, which requires "an agreement or understanding that the person or someone else will receive

VALVE'S MOT. TO DISMISS
CASE NO. 2:26-CV-00788-JHC                - 17 -

Tyz Law Group
1 EMBARCADERO CENTER, SUITE 1200
SAN FRANCISCO, CA 94111
(415) 868-6900

something of value in the event of a certain outcome" of a contest of chance. RCW 9.46.0237. Plaintiffs acknowledge everyone who opens a mystery box gets one skin without exception. *See* Compl. ¶¶ 2, 32, 36. And Plaintiffs acknowledge every skin can equally be used in-game, collected, or traded with friends.[4] *See* Compl. ¶¶ 29, 45. Yet Plaintiffs argue "value" must be determined solely by the potential resale price buyers are subjectively willing to pay for a skin at some indeterminate time in the future if a user decides to sell it. *See* Compl. ¶¶ 5, 33, 42–47, 90, 92. Applying that logic and single focus, Plaintiffs argue some players get a skin "worth" less than the price of a key while others get a skin "worth" more. *See* Compl. ¶¶ 2, 33, 35. As discussed below, the Court should reject Plaintiffs' theory that the value of skins is based on what others may hypothetically choose to pay for them on resale. Even if skins were "valued" only based on purchase price (which they are not), that price is the $2.49 players pay for a key to open a mystery box and get a skin in the first place. *See* Compl. ¶¶ 4, 31, 33, 35, 36, 88. The $2.49 price for a key does not change and is not based on the outcome of a game of chance. Thus, the reward element is not met.

*George v. NCAA* is instructive. *See* 945 N.E.2d 150 (Ind. 2011). There, the NCAA used a randomized ticket-distribution system for sporting events where applicants submitted offers to purchase tickets along with payment. *Id.* at 152. The NCAA randomly determined who would receive tickets; successful applicants received a ticket while unsuccessful applicants received a full refund. *Id.* Plaintiffs argued the tickets were a prize under the gambling statute because a ticket could be resold at a greater price on a secondary market compared to the refunded face value of the ticket. *Id.* at 158–59. The court rejected this argument, holding the fair-market value of the tickets is equal to their face value because the event coordinator created the primary market for the tickets. *Id.* at 159. As a result, the court reasoned that the face value of the tickets equals their fair market value on the primary market, not on a speculative secondary market that would

---

[4] And many players interact with skins in different ways at different times. For example, a player might sell a skin only after years of using it in-game. Plaintiffs' theory that players lose money when they receive a skin ignores these many ways that players interact with skins—enjoying, using, collecting, trading, or giving away—that have nothing to do with potential resale price.

VALVE'S MOT. TO DISMISS
CASE NO. 2:26-CV-00788-JHC                - 18 -

Tyz Law Group
1 EMBARCADERO CENTER, SUITE 1200
SAN FRANCISCO, CA 94111
(415) 868-6900

not exist absent the NCAA issuing tickets in the first place. *Id.* at 158–59. The court added the "speculative nature of the secondary market makes it an inappropriate consideration in determining the presence of a prize" because it could fluctuate for "a plethora of reasons." *Id.* Further, using potential resale value of tickets was inappropriate because a successful ticket purchaser "must forego the very benefit acquired through the ticket-allocation process—the license to attend the event." *Id.* at 160.

Here, as in *George*, the amount players might get from reselling skins is speculative and depends on an array of subjective and unpredictable factors, such as player engagement levels and fluctuating demand. *See* Compl. ¶¶ 42–47; *see also George*, 945 N.E.2d at 159 (contrasting NCAA tickets to a gold coin because "there is little speculation as to what the coin will be worth on the secondary market"). Pinning the value of a skin on what it might be resold for is also inappropriate because players who sell a skin must give up the benefit acquired—the ability to use the skin in the game, collect it, or trade it.

The reasoning in *George* also accords with that of the Ninth Circuit in affirming dismissal of claims that trading card packs were gambling. In *Chaset*, the Ninth Circuit held the value of a card pack should be determined before the pack is opened and by what a buyer pays for the pack, not by what the cards inside might be resold for at some future time after the pack is opened. *See* 300 F.3d at 1086–88 ("At the time the plaintiffs purchased the package of cards, *which is the time the value of the package should be determined*, they received value—eight or ten cards, one of which might be an insert card—for what they paid as a purchase price" despite a "secondary market for trading cards . . . which places higher values on some cards than others.") (emphasis added).

And as discussed above, Plaintiffs have not alleged any facts showing how *they personally* use or value skins, nor that *they* ever sold a skin on the Steam Community Market or through a third-party website, which makes their alleged harm based on resale values especially attenuated and hypothetical. *See supra*, Section III.A. The Court should reject Plaintiffs' invitation to overstretch the definition of "thing of value" under the gambling laws based on potential differences in resale prices.

Tyz Law Group
1 EMBARCADERO CENTER, SUITE 1200
SAN FRANCISCO, CA 94111
(415) 868-6900

iv.    Plaintiffs' Interpretation of the Gambling Laws Would Impermissibly Expand Criminal Liability Without Fair Notice

Plaintiffs' interpretation of the gambling laws to cover mystery box openings is contrary to the Fifth and Fourteenth Amendments, which require laws regulating persons or entities provide defendants "fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *see also State v. Williams*, 144 Wash.2d 197, 203 (2001). To provide fair notice, a statute must make clear what conduct is prohibited to people of ordinary intelligence. *United States v. Approximately 64,695 Pounds of Shark Fins*, 520 F.3d 976, 980 (9th Cir. 2008); *Williams*, 144 Wash.2d at 204. A statute is invalid as applied if it fails to give adequate notice that a defendant's particular conduct is forbidden. *United States v. Jimenez*, 191 F.Supp.3d 1038, 1041 (N.D. Cal. 2016). The rule of lenity is a related canon of statutory construction that requires ambiguities in criminal statutes be resolved in favor of a defendant. *City of Seattle v. Winebrenner*, 167 Wash.2d 451, 462 (2009); *see State v. Enloe*, 47 Wash.App. 165, 171 n.1 (1987). The cannon applies equally where—as here—a criminal statute is construed in a civil case because a statute must be interpreted consistently in all contexts. *Leocal v. Ashcroft*, 543 U.S. 1, 12 n.8 (2004); *see also Shark Fins*, 520 F.3d at 980.

Nothing in the Gambling Act of 1974 provides fair notice that mystery box openings are prohibited. Valve has openly offered its mystery boxes for over a decade, and the gambling laws Plaintiffs rely on are even older. In this time, no court in the country has held that mystery boxes are prohibited, much less a court holding them illegal under Washington law. Instead, courts have uniformly rejected claims that mystery boxes are prohibited under analogous gambling laws. *See, e.g.*, *Mai*, 648 F.Supp.3d at 1137–38; *Coffee*, 2022 WL 94986, at *11–13; *Taylor*, 2022 WL 35601, at *2–3; *see also Mason v. Mach. Zone, Inc.*, 140 F.Supp.3d 457, 461–64 (D. Md. 2015); *Soto*, 159 F.Supp.3d at 877–81. As discussed above, courts have also uniformly rejected Plaintiffs' theory that virtual items are things of value based on unsanctioned activity on third-party websites. *See, e.g.*, *Kater*, 886 F.3d at 787–88 & n.2 (applying Washington law); *Mason*, 851 F.3d at 320 n.3; *Mai*, 648 F.Supp.3d at 1137; *Coffee*, 2022 WL 94986, at *13. No one of common intelligence would understand Valve's mystery boxes to be prohibited by Washington's

Tyz Law Group
1 EMBARCADERO CENTER, SUITE 1200
SAN FRANCISCO, CA 94111
(415) 868-6900

gambling laws considering this context. Even if Plaintiffs' interpretation of the gambling laws were reasonable, which it is not, the Court should still adopt Valve's proposed constructions under the rule of lenity. Alternatively, the Court should hold that the gambling laws cannot be applied to Valve's mystery boxes for lack of fair notice.

### C. Plaintiffs Failed to Sufficiently Plead Facts Supporting Their Theories of Deception and Unfairness Under the CPA

Plaintiffs also fail to plausibly allege a CPA claim based on alleged deception or unfairness. In addition to alleging illegality, Plaintiffs allege a variety of supposedly deceptive or unfair acts. *See* Compl. ¶ 102. The Court should also dismiss these CPA claims.

First, all of Plaintiffs' claims relying on allegedly unfair or deceptive acts should be dismissed as insufficient and conclusory. *See Rockwell v. Chase Bank*, No. 10-cv-01602, 2011 WL 2292353, at *13 (W.D. Wash. June 7, 2011). For example, regarding causation, Plaintiffs merely allege that "but for the challenged conduct, Plaintiffs . . . would not have lost money." Compl. ¶ 103. This allegation is a conclusory recitation of the causation element and lacks "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Zulily, LLC v. Amazon.com, Inc.*, 761 F.Supp.3d 1368, 1394 (W.D. Wash. 2024) (Chun, J.). Further, the Ninth Circuit held that conclusory allegations like Plaintiffs' fail to "state a concrete and particularized injury sufficient for Article III standing." *See Mai*, 2024 WL 2077500, at *2.

Second, Plaintiffs' theory of liability based on allegations that mystery boxes exploit psychological mechanisms through animations, sounds, and other game design (Compl. ¶¶ 37–38, 48–55, 102(b)) should also be dismissed under the First Amendment. While Valve disputes Plaintiffs' characterizations, they would not provide a cause of action even if true because video games are protected expression. *See Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 790 (2011). Courts have consistently refused to allow plaintiffs to impose liability based on expressive design choices. In *Courtright v. Epic Games, Inc.*, the court dismissed similar claims focused on video game design, including allegations the game used mystery boxes, near misses, exciting animations, chasing losses, and various reward systems. 795 F.Supp.3d 1156, 1165–66 (W.D.

Tyz Law Group
1 EMBARCADERO CENTER, SUITE 1200
SAN FRANCISCO, CA 94111
(415) 868-6900

Mo. 2025). The court explained that such claims would impose liability on defendants "because their video games are made too entertaining by these 'defective' elements," which would impermissibly impose content-based liability. *Id.* at 1166. The same conclusion was reached in *Angelilli v. Activision Blizzard, Inc.*, where the court held that claims targeting allegedly "addictive" design features of video games, including in-game purchases and rewards, were barred by the First Amendment because they targeted interactive features that made games "engaging and effective at drawing players into its world, and First Amendment protections do not disappear simply because expression is impactful." 781 F.Supp.3d 691, 697, 701–02 (N.D. Ill. 2025). This Court should reject Plaintiffs' attempt to impose liability based on expressive design for the same reasons. Indeed, all of Plaintiffs' claims suffer from First Amendment defects because they would make Valve liable based on its protected speech.

### D. Plaintiffs' Unjust Enrichment Claim Fails

Plaintiffs' unjust enrichment claim alleges mystery boxes are unlawful gambling and seeks to recover profits from an "unlawful loot box system." *See* Compl. ¶ 108. Plaintiffs' unjust enrichment claim is therefore derivative of their claim alleging unlawful gambling, and fails for the reasons discussed above. Further, unjust enrichment "is the method of recovery for the value of the benefit retained absent any contractual relationship." *Young v. Young*, 164 Wash.2d 477, 484 (2008). Here, Plaintiffs acknowledge and rely on their contractual relationship with Valve under the SSA. *See* Compl. ¶¶ 11, 60–62. The Court should dismiss Plaintiffs' unjust enrichment claim.

## IV. CONCLUSION

The Court should dismiss Plaintiffs' claims with prejudice because amendment would be futile. *See Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1041 (9th Cir. 2011). Plaintiffs' claims fail as a matter of law because they lack standing and Valve's mystery boxes are not illegal under Washington's gambling laws. No amendment could cure these fundamental defects. *See Chaset*, 300 F.3d at 1088 (denying leave to amend not an abuse of discretion).

Respectfully submitted,

Dated: June 25, 2026

*s/ Sean Apple*
Ryan Tyz (*pro hac vice*, CA Bar No. 234895)
Ciara McHale (*pro hac vice*, CA Bar No. 293308)
Sean Apple (*pro hac vice*, CA Bar No. 305692)
**TYZ LAW GROUP PC**
1 Embarcadero Center, Suite 1200
San Francisco, CA 94111
Telephone: (415) 868-6900
ryan@tyzlaw.com
ciara@tyzlaw.com
sapple@tyzlaw.com

*s/ Blake Marks-Dias*
Blake Marks-Dias (WSBA No. 28169)
**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, WA 98104
Telephone: (206) 625-8600
bmarksdias@corrcronin.com

Attorneys for Defendant
Valve Corporation

## WORD COUNT CERTIFICATION

I certify that this memorandum contains 8,305 words, in compliance with the Local Civil Rules.

*s/ Sean Apple*
Sean Apple

