The Honorable John H. Chun

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| IN RE VALVE LOOT BOX LITIGATION | No. 2:26-cv-00788-JHC<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS
Case No.: 2:26-cv-00788-JHC
011372-11/5072932 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ...............................................................................................1

II.  BACKGROUND ................................................................................................2

III.  ARGUMENT.....................................................................................................4

    A.  Named Plaintiffs have standing. ..........................................................4

        1.  Named Plaintiffs have Article III standing based on their loss of money. ..................................................................4

        2.  The money Plaintiffs lost at Valve's games is a loss under the RMLGA. ...............................................................6

        3.  Losing money at an illegal game is an injury to property under the CPA.......................................................7

    B.  Valve's loot box scheme violates Washington gambling law. ...............8

        1.  Players stake or risk something of value upon the outcome of a contest of chance. ...................................................9

        2.  Skins and Wallet funds are "things of value" under RCW 9.46.0285......................................................................12

        3.  Players receive "something of value in the event of a certain outcome.".................................................................17

        4.  This interpretation of Washington's gambling laws does not violate the fair notice requirement. ..............................18

    C.  Valve's loot box scheme is a violation of the CPA. ............................20

    D.  Unjust enrichment is successfully pled.................................................22

    E.  Even if the Court finds against Plaintiffs, dismissal without prejudice is proper. ........................................................22

IV.  CONCLUSION.................................................................................................22

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - i
Case No.: 2:26-cv-00788-JHC
011372-11/5072932 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Angelilli v. Activision Blizzard, Inc.*,
   781 F. Supp. 3d 691 (N.D. Ill. 2025) ........................................................................................21

*Brown v. Entertainment Merchants Ass'n*,
   564 U.S. 786 (2011)....................................................................................................................21

*Bullseye Distrib. v. Gambling Comm'n*,
   127 Wn. App. 231 (2005) ..............................................................................................10, 12, 16

*Cantrell v. City of Long Beach*,
   241 F.3d 674 (9th Cir. 2001) .......................................................................................................4

*Chaset v. Fleer/Skybox Int'l, LP*,
   300 F.3d 1083 (9th Cir. 2002) .................................................................................................8, 11

*Chelan County v. Bank of Am. Corp.*,
   2014 WL 3101935 (E.D. Wash. July 7, 2014)............................................................................22

*Czyzewski v. Jevic Holding Corp.*,
   580 U.S. 451 (2017)......................................................................................................................5

*Davidson v. Hensen*,
   135 Wn.2d 112 (1998) ............................................................................................................1, 22

*FTC v. Amazon.com, Inc.*,
   735 F. Supp. 3d 1297 (W.D. Wash. 2024)..................................................................................20

*G.G. v. Valve Corp.*,
   579 F. Supp. 3d 1224 ...............................................................................................................3, 6

*G.G. v. Valve Corp.*,
   No. C16-1941JLR, 2020 WL 7385710 (W.D. Wash. Dec. 16, 2020)........................3, 4, 6, 21

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*,
   105 Wn.2d 778 (1986) ................................................................................................................20

*Harris v. County of Orange*,
   682 F.3d 1126 (9th Cir. 2012) ....................................................................................................15

*Heitfeld v. Benevolent & Protective Ord. of Keglers*,
   36 Wn.2d 685 (1950*)* ...........................................................................................................4, 5, 7

*Kelly v. First Astri Corp.*,
   72 Cal. App. 4th 462 (1999) .........................................................................................................5

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - ii
Case No.: 2:26-cv-00788-JHC
011372-11/5072932 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ..................................................................................................................4

*Melendres v. Arpaio*,
    784 F.3d 1254 (9th Cir. 2015) ..................................................................................................6

*Noel v. Cole*,
    98 Wash. 2d 375 (1982) ...........................................................................................................22

*O'Neil v. Crampton*,
    18 Wn.2d 579 (1943) .................................................................................................................7

*Panag v. Farmers Ins. Co.*,
    166 Wn.2d 27 (2009) ..............................................................................................................7, 8

*Price v. Pinnacle Brands, Inc.*,
    138 F.3d 602 (5th Cir. 1998) ....................................................................................................8

*Saucedo v. John Hancock Life & Health Ins. Co.*,
    185 Wn.2d 171 (2016) .............................................................................................................20

*Soto v. Sky Union, LLC*,
    159 F. Supp. 3d 871 (N.D. Ill. 2016) .....................................................................................14

*Spokeo, Inc. v. Robins*,
    578 U.S. 320 (2016) ..................................................................................................................5

*State v. Graham*,
    182 Wn. App. 180, 327 P.3d 717 (2014) ...............................................................................13

*State v. Sullivan*,
    143 Wn.2d 162 (2001) .............................................................................................................13

*United States v. Shill*,
    740 F.3d 1347 (9th Cir. 2014) ................................................................................................20

*United States v. Williams*,
    553 U.S. 285 (2008) ................................................................................................................19

*Van v. LLR, Inc.*,
    962 F.3d 1160 (9th Cir. 2020) ..................................................................................................5

**STATUTES**

RCW 4.24.070 .................................................................................................................... *passim*

RCW 9.46 ...................................................................................................................................20

RCW 9.46.010 .................................................................................................................1, 12, 21

RCW 9.46.0237 ................................................................................................................. *passim*

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - iii
Case No.: 2:26-cv-00788-JHC
011372-11/5072932 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

RCW 9.46.0241 ...................................................................................................................11

RCW 9.46.0285 ............................................................................................................ *passim*

**OTHER AUTHORITIES**

12 C.F.R. § 1002.2(j) ..........................................................................................................17

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - iv
Case No.: 2:26-cv-00788-JHC
011372-11/5072932 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

## I.    INTRODUCTION

Plaintiffs bring three claims: violation of the Recovery of Money Lost at Gambling Act ("RMLGA"), violation of the Consumer Protection Act, and unjust enrichment. Each is adequately pled. Plaintiffs have standing to bring all three.

The RMLGA allows recovery of money lost at illegal gambling games. RCW 4.24.070. The statute has three elements: a stake, a contest of chance, and a reward. RCW 9.46.0237. All three elements are pled. *See* Section III.B, *infra*.

Valve's conduct also violates the Consumer Protection Act. Washington's Gambling Act declares that the public interest requires strict regulation to prevent commercialization of gambling activities. RCW 9.46.010. Courts in this District have already found that operating an illegal gambling scheme in violation of that mandate is an unfair practice under the CPA.

Plaintiffs' unjust enrichment claim survives as well. Valve argues its contractual agreements with users bars it. But wagering contracts are void under Washington law, and thus, cannot bar restitution. *Davidson v. Hensen*, 135 Wn.2d 112, 129–30 (1998).

Valve makes three primary arguments in response.

First, Valve argues the skins are valuable—Plaintiffs paid $2.49 to open a loot box, received a skin worth something in return, and therefore got the benefit of their bargain and suffered no injury. For this Valve cites an unpublished Ninth Circuit memorandum applying California law, a string of federal RICO decisions, and a Washington case about leggings advertised as discounted from a regular price that never existed. Mot. to Dismiss, Dkt. No. 32 (hereafter "Mot.") at 7–11. This is a case about Washington's gambling laws. Plaintiffs lost money at games Washington law forbids. That is a violation of a protectable interest that Washington has recognized since 1879. It is all that Article III, the RMLGA, or the CPA requires for standing.

Second, Valve argues the skins are not valuable—they do not qualify as things of value for purposes of the RMLGA. Valve's argument ignores the complaint's allegations that a skin can be sold on Valve's own Community Market ("Market"), in a single click, for Steam Wallet ("Wallet") funds. Those Wallet funds can be used for transactions, including purchasing a computer and paying the accompanying taxes. A skin also funds the next draw—sell it for Wallet funds, buy

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - 1
Case No.: 2:26-cv-00788-JHC
011372-11/5072932 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

another key, open another box—all on Valve's own platform Steam, all without spending another dollar.

Third, Valve argues the skins all provide the same value—every player receives one skin in exchange for $2.49, so the transaction is an ordinary purchase. The statute asks a different question: whether the player has "an understanding" that they, as a result of staking something upon a contest of chance, "will receive something of value in the event of a certain outcome." RCW 9.46.0237. A user understands that one outcome is worth pennies and another is worth hundreds of dollars—because Valve's Market displays the price of every skin. ¶¶ 35, 47.[1] Valve then designed a spinning animation, color-coded by rarity, to reveal the result. That choice makes no sense unless the outcome matters.

Valve compares its loot boxes to a pack of baseball cards. Mot. at 1. But Topps, or any other card company, does not build a slot-machine animation into the moment a customer opens a pack. Topps does not operate a proprietary exchange where every card is priced, listed, and sold for credits redeemable only at the Topps store. Topps does not require its customers to sign an agreement confining all value to the Topps ecosystem. And when a customer opens a pack and finds a valuable card, Topps does not take a cut when that card is resold. Valve does all of these things, and it does them at enormous scale. What Valve built is not a product with a surprise inside. It is a casino from which it has unlawfully collected billions of dollars in revenue.

## II.   BACKGROUND

Three of Valve's largest franchises—Counter-Strike, Dota, and Team Fortress—are free to download and free to play. ¶ 28. Currently, a player pays Valve $2.49 for a key in one of these games using either cash or Steam Wallet funds. The key opens a container. Inside is one skin, selected at random by Valve's servers from amongst many options. ¶¶ 31, 39. Some options are extremely rare and valuable, and others are not. Valve sets the odds, and they are not generous: roughly 96% of the time, the skin a player receives is worth less than the key that opened the box.

---

[1] Citations to "¶__" are to the Consolidated Class Action Complaint, Dkt. No. 23.

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - 2
Case No.: 2:26-cv-00788-JHC
011372-11/5072932 V1

¶ 35. The odds of drawing the most prized items can be extreme—for one loot box, the rarest item in it was drawn one out of every 146,000 times. ¶ 33.

Independent analysts estimate that Valve generated over $1 billion from Counter-Strike key sales alone in 2025. ¶ 28. Bloomberg has reported that the market for Counter-Strike skins alone has surpassed $4.3 billion. ¶ 48.

Valve built the marketplace where this value is realized. The Steam Community Market lets players list skins for sale at prices Valve computes and displays in dollar amounts. ¶¶ 42, 44. Buyers pay in Steam Wallet funds—a dollar-denominated balance with the purchasing power of cash on Valve's platform. ¶ 24. Valve takes a 15% commission on every transaction. ¶ 42. Wallet funds can purchase games, gaming hardware, and more keys. ¶¶ 20, 39. And like all property, "Steam Wallet funds that are deemed unclaimed property may be turned over to the applicable authority." Apple Decl. Ex. 1, Dkt. No. 33-1 ("SSA") at § 3.C.

The opening plays as a slot-machine animation. Possible items spin across the screen and slow to a stop on the player's prize. The animation is engineered to produce near-miss results, the false sense that something rare was just out of reach. ¶¶ 37–38. To create a Steam account, a user need only click a checkbox stating they are thirteen or older. ¶ 68. Teenage boys are a core audience for Counter-Strike. ¶ 68.

Peer-reviewed research has found a significant link between loot box spending and problem gambling. ¶ 63. A subsequent study found no such link for trading cards. ¶ 64. When foreign regulators in Belgium and the Netherlands concluded that loot boxes constitute unlawful gambling, Valve disabled them. ¶ 69. It modified its system in China to comply with odds-disclosure requirements. *Id.* In the United States, it has done neither. The loot box system works the same way across all three of Valve's flagship games. ¶ 32.

Valve has been sued over its loot box system before. In *G.G. v. Valve Corp.*, plaintiffs brought a case challenging "skins gambling"—the practice of taking Valve skins and using them as credits on external, third-party websites that ran their own gambling games—as well as a version of the theory asserted here: loot boxes are gambling. 579 F. Supp. 3d 1224, 1227–30, 1232–34 (W.D. Wash. 2022). The *G.G.* Court denied Valve's motion to dismiss a CPA claim based on the loot box

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - 3
Case No.: 2:26-cv-00788-JHC
011372-11/5072932 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

theory. *G.G. v. Valve Corp.*, No. C16-1941JLR, 2020 WL 7385710 at \*18-19 (W.D. Wash. Dec. 16, 2020).[2] The *G.G.* plaintiffs brought no claims under the RMLGA. The case ended at summary judgment, where the court found that the parent plaintiffs—who did not play Valve's games, did not use Steam, and did not spend their own money on loot boxes—had produced no evidence of injury. 579 F. Supp. 3d at 1232–33. Plaintiffs here played the games, used Steam, purchased keys with their own money, and bring claims under the RMLGA.

## III.   ARGUMENT

### A.   Named Plaintiffs have standing.

Valve makes three arguments that Plaintiffs have not alleged injury: no Article III standing, no loss under the RMLGA, no injury to "business or property" under the CPA. All three fail for the same simple reason: Plaintiffs lost money at Valve's illegal gambling games, and that is cognizable injury under all three.

### 1.   Named Plaintiffs have Article III standing based on their loss of money.

Valve argues that Plaintiffs suffered no injury because they received something every time they paid to open a loot box. An injury in fact is an "invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). State law can supply the protected interest. *Cantrell v. City of Long Beach*, 241 F.3d 674, 684 (9th Cir. 2001). Washington has supplied the protected interest at issue here since 1879. The RMLGA gives "[a]ll persons losing money or anything of value at or on any illegal gambling games" a cause of action to recover it from the proprietor for whose benefit the game was played. RCW 4.24.070. Under the statute, money lost at gambling is "unlawfully detained by the winner" and "rightfully belongs to the loser." *Heitfeld v. Benevolent & Protective Ord. of Keglers*, 36 Wn.2d 685, 693 (1950).

---

[2] Valve's misleading claim that a District Court, "two arbitrators, and the Ninth Circuit previously resolved similar claims in Valve's favor" is all in reference to the protracted proceedings in this same case. Mot. at 6-7. In denying Valve's motion to dismiss the CPA claim, Judge Robart rejected Valve's argument that the loot box theory was properly before and decided by the arbitrator in *G.G.*, 2020 WL 7385710 at \*14.

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - 4
Case No.: 2:26-cv-00788-JHC
011372-11/5072932 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

Each Plaintiff paid Valve to open a loot box. The opening was the gamble. Every dollar paid is money lost "at or on" an illegal gambling game within the meaning of RCW 4.24.070. ¶¶ 12–17. That is the injury Washington recognizes. It is also the paradigm of Article III concreteness: "a loss of even a small amount of money is ordinarily an 'injury.'" *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017); *Van v. LLR, Inc.*, 962 F.3d 1160, 1162 (9th Cir. 2020). Far from a bare procedural violation divorced from concrete harm, *Spokeo, Inc. v. Robins*, 578 U.S. 320, 341 (2016), this is the specific harm the statute was enacted to prevent: "'[t]o take money from a person by gaming is, in a just sense, a wrong done to his estate.'" *Heitfeld*, 36 Wn.2d at 692 (quoting *Meech v. Stoner*, 19 N.Y. 26 (1859)).

Valve's lead authority in challenging Plaintiffs' Article III standing is *Mai v. Supercell Oy*—an unpublished memorandum, three pages long, that Circuit Rule 36-3 forbids citing as precedent. It is also inapplicable because California is, thankfully, not Washington. In that case, two players sued a game developer under California's Unfair Competition Law, alleging that loot boxes in its mobile games were illegal gambling and that they were injured by "spent money" on them. 2024 WL 2077500, at *1. But California intentionally closes its courts to gambling-loss recovery: "in the absence of a statutory right" to recover such losses, the action is "barred as a matter of California law and public policy." *Kelly v. First Astri Corp.*, 72 Cal. App. 4th 462, 466 (1999). Therefore, these California Plaintiffs had no protected interest in recovering gambling losses specifically authorized by statute. The panel's conclusion follows from California law, and it says nothing about a state that made the opposite choice. Washington enacted the statutory right California lacks, RCW 4.24.070.

*Kater v. Churchill Downs, Inc.* shows what is required for Article III standing under the RMLGA. The Plaintiff there received everything she paid for—chips and the spins that the chips bought. The Ninth Circuit revived her RMLGA claims anyway, in a published opinion. 886 F.3d 784, 785–89 (9th Cir. 2018). It could not have done so if she lacked standing; courts must raise that problem on their own, as *Mai* itself reminds us. 2024 WL 2077500, at *1. Nor is *Kater* alone. Federal courts sitting over RMLGA claims have treated the money lost as injury for the purpose of standing, without pause: in *Larsen v. PTT, LLC*, a court in this District entered judgment for a

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

plaintiff whose loss was money spent purchasing virtual coins—coins he could never cash out, spent on games he sometimes won. 737 F. Supp. 3d 1076, 1085, 1089 (W.D. Wash. 2024).

Valve argues that because the named Plaintiffs purchased Counter-Strike loot boxes, they lack standing to pursue claims concerning loot boxes in Dota 2 and Team Fortress 2. Mot. at 8. What Valve presents as a standing defect is an argument about whom the named Plaintiffs may represent, and the Ninth Circuit has made clear that is a class certification question: once the named plaintiff has standing for his own claims, whether he may represent class members whose claims arise from related conduct is a "question of class certification . . . not a question of standing." *Melendres v. Arpaio*, 784 F.3d 1254, 1262-63 (9th Cir. 2015). Valve relies on *G.G. v. Valve Corp.*, 579 F. Supp. 3d 1224, but *G.G.* was decided at summary judgment. The plaintiffs there—parents who gave money to their children—produced "no evidence" the parents themselves gave money for Dota 2 or Team Fortress 2, so they could not prove their own injury for claims relating to those games. *Id.* at 1232. The holding is that named plaintiffs cannot survive summary judgment on claims they cannot prove. Plaintiffs here are at the pleadings stage, their own injury is alleged, and the allegations control.

**2.    The money Plaintiffs lost at Valve's games is a loss under the RMLGA.**

Valve argues that Plaintiffs fail to state an RMLGA claim because "[a] loss under the RMLGA means a net loss, not merely a payment made in anticipation of playing a game," and because Plaintiffs "allege nothing about the outcome of opening a mystery box." Mot. at 9.

Every dollar Plaintiffs spent on opening loot boxes has been lost. Valve's system is designed so that real money flows in one direction: from the player to Valve. A player pays cash for a key. The key opens a box. The box yields a skin. The skin can be sold—but only for Wallet funds, which cannot be redeemed for cash. SSA § 3.C. And selling a skin for actual money—anywhere—violates the provision of the Subscriber Agreement that Valve's own motion cites. SSA § 1.C; Mot. at 14. Every real dollar a player has paid Valve for a key, Valve has kept. Valve wrote the terms that make sure of it.

In *Kater*, the Ninth Circuit reversed dismissal of an RMLGA claim where the alleged loss was money spent purchasing virtual chips—chips that, like skins, could not be redeemed for cash.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

886 F.3d at 787, 789. The court treated the money spent as the loss. *Id. Larsen* did the same: money lost purchasing virtual coins for unlawful gambling was a recoverable loss, and the court entered judgment. 737 F. Supp. 3d at 1085, 1089. In neither case did the court require the plaintiff to plead what happened on each individual spin.

Valve relies on *Heitfeld* for the proposition that RMLGA damages must be offset by winnings. But in *Heitfeld*, the winner received cash back from the gambling operation when they won a game. 36 Wn.2d at 696. Here, there is nothing to offset—no player has ever received cash from Valve. And even where a plaintiff has won from time to time, the Washington Supreme Court has approved jury instructions providing that no deductions should be made for amounts won. *O'Neil v. Crampton*, 18 Wn.2d 579, 586 (1943). Plaintiffs have alleged what the statute requires: money lost at illegal gambling games. ¶¶ 12–17; RCW 4.24.070.

Valve also argues the loss happened in the wrong place—that "money spent to buy keys is not a loss at or on a gambling game." Dkt. 32 at 9. But a key does nothing except open a box. Buying one is entering the contest of chance. The chips in *Kater* were purchased before the spin too, and the money spent on them was the loss. 886 F.3d at 787–89. A casino does not avoid the gambling laws by selling its chips at a window down the hall from the tables.

**3.      Losing money at an illegal game is an injury to property under the CPA.**

Valve argues that Plaintiffs suffered no cognizable injury under the CPA because they received "the benefit of the bargain they knowingly struck." Mot. at 9. The injury element for the Consumer Protection Act "is met upon proof the plaintiff's 'property interest or money is diminished because of the unlawful conduct even if the expenses caused by the statutory violation are minimal.'" *Panag v. Farmers Ins. Co.*, 166 Wn.2d 27, 57 (2009) (quoting *Mason v. Mortg. Am., Inc.*, 114 Wn.2d 842, 854 (1990)). Injury "is distinct from 'damages,'" and need not be quantified. *Id.* at 57–58.

Plaintiffs' money was diminished: they paid it to Valve and lost it at Valve's games. *Larsen* applied *Panag* to the same injury—money lost purchasing virtual coins for unlawful gambling— and entered judgment on the CPA claim. 737 F. Supp. 3d at 1089.

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - 7
Case No.: 2:26-cv-00788-JHC
011372-11/5072932 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

Valve also relies on federal RICO decisions addressing injury in the context of trading card purchases. Mot. at 9–10. Those cases held that a buyer who receives a pack of cards—including a chance at a rare insert—suffers no cognizable injury when the rare card is not inside. *Chaset v. Fleer/Skybox Int'l, LP*, 300 F.3d 1083, 1087 (9th Cir. 2002); *see also Price v. Pinnacle Brands, Inc.*, 138 F.3d 602, 607 (5th Cir. 1998). The injury alleged was disappointment in the result. Plaintiffs allege no such thing. They do not claim they were injured because they drew a common skin instead of a rare one. They claim they were injured because every loot box opening was an illegal gambling transaction—and every dollar spent on one was lost at a game Washington law forbids, regardless of the outcome. That is the injury *Panag* recognizes: money diminished because of unlawful conduct. 166 Wn.2d at 57.

The only Washington case that Valve cites is *Montes v. SPARC Grp. LLC*, 6 Wn.3d 321 (2026). The plaintiff there bought $6.00 leggings, received $6.00 leggings—"the fungible product she sought to obtain"—and claimed injury from a discount measured against a fictitious regular price. *Id.* at 324. The court held she alleged no economic loss, because "the mere fact of a retail transaction does not imply economic loss": her money went out, but "the consumer receives something of value" in return. *Id.* at 333. What she lost was the savings she believed she was getting—"dashed expectations," and "disappointment is not a cognizable CPA injury." *Id.* at 334, 337. Plaintiffs allege nothing of the kind. Their claim is that Washington law prohibits the transaction and makes the money they lost buying loot boxes recoverable. And "economic losses count as injuries to 'business or property' under the CPA." *Id.* at 324. The *Montes* plaintiff kept her leggings and lost nothing but an illusion. Plaintiffs lost their money. They have suffered an injury under the CPA.

**B.    Valve's loot box scheme violates Washington gambling law.**

Valve argues that opening a loot box is a purchase, not a wager, because every player receives a skin. But Washington's gambling statute defines gambling by the structure of the transaction, and Valve's loot boxes satisfy each element.

The Recovery of Money Lost at Gambling Act (RMLGA), allows for recovery of money lost "at or on any illegal gambling games." RCW 4.24.070. In turn, RCW 9.46.0237 defines

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - 8
Case No.: 2:26-cv-00788-JHC
011372-11/5072932 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

gambling as (1) "staking or risking something of value" (2) "upon the outcome of a contest of chance or a future contingent event not under the person's control or influence," (3) "upon an agreement or understanding that the person or someone else will receive something of value in the event of a certain outcome."[3]

Every element is met here.

*Staking on a contest of chance.* A player pays Valve $2.49 for a key. The key does one thing: it opens a loot box. The $2.49 is the stake. The opening of the loot box is a contest of chance. Valve's servers select a skin at random from a set whose contents vary in value by orders of magnitude. ¶¶ 31, 33, 39. The player does not know what she will receive. Valve sets the odds. Roughly 96% of the time, the skin is worth less than the key that opened the box. ¶ 35.

*Something of value*. The skins are things of value. Each is exchangeable for property—Wallet funds on Valve's Market that buy games or hardware. And each is a form of credit extending the privilege of play because the wallet funds can be used to buy keys to open more boxes.

*Reward in the event of a certain outcome.* Not every player receives the same value. One skin sells for pennies on Valve's own Market; another sells for hundreds of dollars. Valve's odds decide which. That is the prize, and it is what the player is paying for.

Valve contests each element. None of its arguments finds support in the statute or the cases applying it.

**1.      Players stake or risk something of value upon the outcome of a contest of chance.**

Valve argues that paying for a key is "an ordinary commercial purchase, not a stake or risk," because every player who opens a loot box receives a skin from a disclosed set. Mot. at 11. But getting a product back does not make the purchase risk-free. The risk is what the product turns out to be.

Here, a player pays to open a loot box that contains a number of possible skins. ¶ 31–32. It is not contested that the possible skins are of a "disclosed set"; what matters is that the value of the

---

[3] Any gambling under RCW 9.46.0237 not authorized by the legislature is "illegal" under the RMLGA, and "[a]ll online or virtual gambling is illegal in Washington." *Kater*, 886 F.3d at 786.

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - 9
Case No.: 2:26-cv-00788-JHC
011372-11/5072932 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

skins are not alike. On the Valve-operated Community Market, some skins sell for a few cents; others sell for hundreds of dollars. ¶¶ 33–36. The odds of drawing each skin are set by Valve. *Id.* The player does not know what they will draw. *Id.* Their $2.49 is the stake. The draw is the contest of chance.

Courts applying Washington law have repeatedly held that this structure—a fixed payment, a guaranteed item, and chance determining what the player gets—is gambling. In *Kater*, every Big Fish Casino player who paid received exactly what she paid for: virtual chips from a disclosed price list, chips the Terms of Use declared had "no monetary value." 886 F.3d at 786. The Ninth Circuit held the platform was illegal gambling under RCW 9.46.0237 and that Kater stated a claim under the RMLGA for the money she spent. *Id.* at 787–90. In *Larsen*, players purchased virtual coins and always received virtual coins; the court found illegal gambling under the same statutes. 737 F. Supp. 3d 1076.

And in *Bullseye Distrib. v. Gambling Comm'n*, 127 Wn. App. 231 (2005), the Court of Appeals confronted the design in its purest form. A customer inserted a dollar into a sports-card vending machine—built to emulate a slot machine, with simulated spinning reels and casino sounds—and received one collectible card and twenty play points. *Id.* at 234–35. The customer could take the card and walk away. But the points could run the slot machine, and winning meant prize points redeemable for cash or merchandise. *Id.* at 235–36.

Bullseye's argument was, in substance, the same one Valve makes here: nothing was staked, because the dollar bought the card. The points were just a free promotion that came along with the purchase. The Court of Appeals rejected that argument because accepting it would mean "one could combine the operation of any slot machine with the sale of a product, thus separating the consideration from the gambling device and marrying it to the product sale." *Id.* at 242.

Valve answers that every player who opens a box receives a skin, so the $2.49 "describes an ordinary commercial purchase, not a stake or risk where either the player or the house wins." Mot. at 11. But the defining feature of an ordinary commercial purchase is that everyone who pays the same price for the same product receives the same value. Two customers who each pay $2.49

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - 10
Case No.: 2:26-cv-00788-JHC
011372-11/5072932 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

for a candy bar walk out with identical candy bars. Swap the bars behind the counter and neither customer would notice.

Two players who each pay Valve $2.49 and open the same box do not receive indistinguishable items: one may draw a skin that can be sold on Valve's own market for hundreds of times the value of the other. ¶¶ 2, 35. Swap those, and both players would notice at once. Identical payments lead to unequal outcomes. That is not a retail purchase. It is a contest of chance.

Washington's definition of a "gambling device" confirms the point. Under RCW 9.46.0241, a gambling device is one that "does not return the same value or thing of value for the same consideration upon each operation thereof." Valve's argument that loot boxes cannot be gambling because every player receives a skin is inconsistent with that approach. The statute does not ask whether the player receives something—it asks whether she receives the same value for the same price each time. She does not.

Valve warns that treating this transaction as a wager would "criminalize vast swaths of retail commerce," from baseball cards to book subscriptions. Mot. at 12. None of those products satisfies the statute's three-element test. A baseball card manufacturer does not operate a marketplace that prices each card in dollars, does not take a commission on every resale, and does not build a slot-machine animation to reveal what the buyer drew. In other words, the cards do not "contemplat[e] [the] transfer of money or property," nor extend gameplay, as Valve's skins do within Valve's own ecosystem. RCW 9.46.0285.

Valve's sole authority otherwise is *Chaset v. Fleer/Skybox International, LP*, 300 F.3d 1083. *Chaset* is a RICO case about baseball cards. *Id.* at 1085. It asked whether disappointed pack buyers were injured in their business or property under RICO's standing provision. *Id.* at 1085–88. It did not interpret Washington law. *Id.* It did not apply RCW 9.46.0285. *Id.* The Ninth Circuit has already explained what to do with authority of this kind when interpreting the RMLGA: in *Kater*, the defendant relied on cases holding that virtual-currency games were not gambling under Maryland, Illinois, and California law. 886 F.3d at 788-89. But the Ninth Circuit set them aside because the question presented "turns on Washington statutory law, particularly its broad definition of 'thing of value.'" *Id.* The question here turns on Washington law as well, and Washington's

answer runs from *Bullseye* through *Kater* to *Larsen*: a guaranteed product does not launder the gamble sold with it.

**2.      Skins and Wallet funds are "things of value" under RCW 9.46.0285.**

A "thing of value" is "any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise, directly or indirectly, contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge." RCW 9.46.0285. The legislature directed that the chapter "be liberally construed." RCW 9.46.010.

Skins qualify in two independent ways. They are exchangeable for money or property. And they are a form of credit extending entertainment and the privilege of play.

**a.      A skin is exchangeable for money in a single transaction on Valve's own Market.**

Valve argues that skins are not "things of value" because they are not exchangeable for money or property, and its Subscriber Agreement states that Wallet funds "do not constitute a personal property right." Mot. at 13–16; SSA § 3.C. But whether something is a "thing of value" under RCW 9.46.0285 is a question the statute answers based on the factual evidence, not one Valve can contract around by declaring in its SSA that Wallet funds are not property.

Here is what the complaint alleges. A skin sits in the player's Steam Inventory. *See* ¶ 50; Dkt. # 33-3. Next to it, Valve computes and displays the skin's current price on the Community Market, in dollars. ¶¶ 42, 44, Figs. 12-13. Below the price is a green button marked "Sell." *See* ¶ 42, Fig. 12**.** One click lists the skin for sale. *See id.* When it sells, Valve deducts a transaction fee and credits the rest to the player's Wallet. ¶¶ 42-43. All of this is shown to the user on their account, as shown in the figure below. ¶ 42.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

**Picture 1** (¶ 42, Fig. 12)

Every dollar a user deposits in the Wallet carries the equivalent purchasing power of one dollar on the Steam platform, ¶ 24, and Wallet funds have "the purchasing power of cash" there—buying games, hardware, and more keys, ¶ 42; SSA § 3.C.

A fund balance that can be used to purchase items and pay accompanying taxes is a form of property under any ordinary understanding of those words.[4] *State v. Sullivan*, 143 Wn.2d 162, 175 (2001) ("In the absence of a statutory definition, [courts] will give the term its plain and ordinary meaning ascertained from a standard dictionary.").

A gift card is subject to the same conditions. It spends at one merchant and cannot be redeemed for cash. No one doubts that a $789 gift card is a form of property, or that a person who

---

[4] Valve argues at length that Wallet funds are not "money," importing definitions from the Uniform Commercial Code, RCW 62A.1-201(24), and the Uniform Money Services Act, RCW 19.230.010. Mot. at 13. Nothing in chapter 9.46 borrows its terms from the UCC, but the Court need not resolve the point. The statute asks whether a skin is "exchangeable for money *or property*," RCW 9.46.0285, and Wallet funds are property whether or not they are also money.

takes your gift card has taken something of value. *See State v. Graham*, 182 Wn. App. 180, 182, (2014) ("[T]he first transaction . . . consisted only of theft of a gift card . . . . The second transaction . . . consisted only of use . . . of that *property* in its intended manner; using the gift card as cash." (2d, 4th, 5th alterations in original) (emphasis added)). And the same section of the same agreement provides that "Steam Wallet funds that are deemed unclaimed property may be turned over to the applicable authority." SSA § 3.C. Things that are not property do not escheat.

Skins are also exchangeable for physical property. A player can purchase a Steam Deck—a physical computer, priced at $789 in real-world cash—using Wallet funds alone (see Picture 2, below). ¶ 43; *see* SSA § 3.C. Valve's agreement acknowledges that the machine is the property of the user once payment has been completed: "Any Hardware delivered to you remains property of Valve until payment has been fully made." SSA § 1.D. Valve claims that the transfer of skins for physical property is "attenuated" because the hardware has no property value until it is sold "to a third party outside of Steam." But there is nothing theoretical or indirect about the exchange of skins for physical property: With one click, you sell a skin for Wallet funds. With another, Wallet funds buy a computer that would have otherwise cost you significant cash. Thus, it was the skin that you "exchange[d] for money or property." RCW 9.46.0285.[5]

---

[5] Valve disputes that it participates in the money exchange that occurs on third party sites. But Valve's own authority, *Soto v. Sky Union, LLC*, 159 F. Supp. 3d 871 (N.D. Ill. 2016), shows how Valve does participate in the exchange that happens on its own marketplace. In *Soto*, the items could not be sold at all—not to the operator, not to other players—and the only path to money was the sale of a player's entire account on a market "not provided or endorsed" by the operator. *Id.* at 879–80. Skins sell individually, on Valve's own market, at prices Valve displays, for fees Valve collects.

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - 14
Case No.: 2:26-cv-00788-JHC
011372-11/5072932 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

**Picture 2:** The Steam Deck, a portable gaming computer available for purchase in Steam.[6]

Valve argues about a different chain—one ending with the player reselling her hardware to a third party for cash. Mot. at 15–16. The statute has no such step. It reads "money *or property*." RCW 9.46.0285. The exchange is complete when the property arrives. What the player does with her hardware after that is not the statute's concern.

Valve emphasizes that *Kater* held that a virtual item cannot be a thing of value based on its resale. Mot. at 14-15. *Kater* concluded that a "thing of value" cannot rest on "this prohibited use" of third-party resales where the Defendant did not operate a market of their own. 886 F.3d at 787 n.2. Selling a skin on the Community Market is an authorized use. ¶¶ 42–44. *Kater* shows why Valve is unique. Other operators banned the markets that valued their items. 886 F.3d at 787 n.2. Valve runs one.

---

[6] The Court may take judicial notice of Valve's publicly available storefront page under Federal Rule of Evidence 201(b)(2). *See Harris v. County of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012). The Complaint references the Steam Deck purchase at ¶ 43. Valve's own declarant submitted comparable platform screenshots in support of its motion. Dkt. No. 33.

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - 15
Case No.: 2:26-cv-00788-JHC
011372-11/5072932 V1

**b.** **Skins and Wallet funds are a "form of credit . . . involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge."**

Valve argues that even if skins can be sold and the proceeds used to open another loot box, those are "independent transactions"—too attenuated to constitute an extension of the privilege of playing. Mot. at 17.

The statutory provision is defined to include a credit or promise "directly *or indirectly*" involving extension of play. RCW 9.46.0285. A rule that value must arrive in a single step is precisely what the word "indirectly" forecloses. And the indirection here is modest: two steps, both on Valve's platform, both at prices Valve displays, both paying Valve. ¶¶ 35-36, 42-44.

The question courts have asked when applying this prong is a simple one: does the item fund continued play? In *Kater*, virtual chips did—they were "a credit that allows a user to place another wager or re-spin a slot machine." 886 F.3d at 787. Without chips, the player could not play; with them, she could. In *Bullseye*, play points that "lack[ed] pecuniary value on their own" did the same: they were things of value "because they extend the privilege of playing the game without charge." 127 Wn. App. at 242.

A player sells a skin on the Community Market—one click, at the price Valve displays—and receives Wallet funds. *See* ¶¶ 42, 50, Fig. 12; Dkt. # 33-3. With those funds she purchases a key to open another loot box: Valve's own motion explains that a player can pay "directly to open the box." Mot. at 4. She has not left Steam. She has not spent another dollar of her own money. A player owning a valuable skin holds future draws, the same way a player holding chips holds future spins.

And opening loot boxes is the play being extended. Each of the games presents its loot boxes through a dedicated interface, with spinning reveals, color-coded rarity tiers, and the sights and sounds of a casino floor. ¶¶ 37-40, 52-53. Washington law does not ask whether the gambling fills the whole game or one corner of it. The gambling in *Kater* was casino games inside a game platform. 886 F.3d at 786. The gambling in *Bullseye* was a slot machine bolted to a vending machine. 127 Wash. App. at 234–35.

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - 16
Case No.: 2:26-cv-00788-JHC
011372-11/5072932 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

Valve says a skin is not a "credit," borrowing a definition from Regulation B—a federal rule implementing the Equal Credit Opportunity Act. Mot. at 16; 12 C.F.R. § 1002.2(j). The Equal Credit Opportunity Act has nothing to do with this statute. Washington's Gambling Act defines its own terms, and it says "any form of credit or promise." RCW 9.46.0285. The *Kater* chips deferred no payment and incurred no debt. 886 F.3d at 786-89. The Ninth Circuit called them a credit anyway. *Id.* at 787.

Valve finally warns that on Plaintiffs' reading, anything sellable would extend the privilege of playing, sweeping in card packs and blind boxes. Mot. at 17. The statutory text answers the worry. The prong focuses on "form of credit . . . involving extension of . . . a privilege of playing at a game or scheme without charge." RCW 9.46.0285. A baseball card is resold for money, in the open economy. Topps issues no credits, keeps no ledger, and does not bind its buyers to an agreement restricting where a card may be sold or how the player spends the money.

But a skin sells for Wallet funds: a balance Valve issues, denominates in dollars, and confines to the platform where Valve sells the next box. An obligation one party owes another is a credit. An asset the holder can spend is property. What Valve owes the player is what the player owns.

Valve's refrain that Wallet funds "can be used on Steam but never converted to cash" is not a defense to this element. It is the element. The chips in *Kater* extended play for the same reason—credits worthless anywhere else, potent inside. 886 F.3d at 787. The prong has never reached a card pack because no card company runs an ecosystem of its own credits—issuing them, keeping the ledger, and selling the next box in exchange for them. Valve does.

**3.    Players receive "something of value in the event of a certain outcome."**

Valve argues that all players receive the "same value" because every player receives a skin after opening a loot box. Mot. at 17–18. But receiving the same thing is not receiving the same value. Here, a player opens a loot box knowing she will receive one skin from a disclosed set, knowing the skins carry different rarity tiers, and knowing—because Valve displays it—that the rarest skins sell on Valve's market for hundreds of times the price of the common ones. ¶ 33.

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - 17
Case No.: 2:26-cv-00788-JHC
011372-11/5072932 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

Every scratch-ticket buyer receives one ticket too. The ticket is the vehicle. The prize is what the scratch reveals. *Kater* looked past the same uniform delivery to the variable outcome: every chip bought one spin, and the court held the reward element was satisfied because value manifested differentially through an odds-based system that extended gameplay in varying amounts. 886 F.3d at 787–89.

Valve further argues that Plaintiffs "fail to plausibly allege mystery box openings establish the reward element." Mot. at 17. Look at what Valve built. The actual outcome is decided by a random number generator on Valve's server the instant the player clicks. ¶ 38. What Valve shows the user is theater: a reel of skins spinning across the screen, color-coded by rarity, before slowing to a stop. *Id.* The animation has no bearing on the outcome. Valve built it anyway—not to determine the result, but to make the result feel like a reward. The player is buying the moment the reel stops.

*George v. NCAA* is Valve's lead case on the reward element, and its facts explain its holding. Mot. at 18–19 (citing 945 N.E.2d 150 (Ind. 2011)). The NCAA allocated scarce tickets by random draw. *George*, 945 N.E.2d at 152-153. Winners received tickets worth $150. *Id.* Losers received their $150 back. *Id.* The Indiana Supreme Court held there was no prize because no one could end up behind: "those receiving tickets got nothing of greater value than those who received refunds." *Id.* at 157–58. Valve refunds no one.[7]

*George* involved a practical problem: too many fans, too few tickets. The NCAA used a random draw to solve it. There is no suggestion it glamorized the chance—no animation, no reel, no color-coded rarities. Valve did—a spinning reel, color-coded rarities, near miss outcomes. ¶¶ 37-40, 52-53. The NCAA allocated tickets. Valve built a slot machine.

**4.    This interpretation of Washington's gambling laws does not violate the fair notice requirement.**

Valve argues it lacked "fair notice" that Washington's gambling laws reach loot boxes, and invokes the rule of lenity. Mot. at 20-21.

---

[7] SSA §§ 1.B, 3.I (incorporating Steam Refund Policy).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

Valve does not contend that "staking or risking something of value upon the outcome of a contest of chance" is unclear language. RCW 9.46.0237. It does not identify a word in the statute whose meaning is in doubt. Its argument is that the statute's elements are not met—skins are not things of value, loot boxes are not contests of chance, and so on. That is the merits argument the Court is deciding in Part III.B, *supra*, and fair notice adds nothing to it. If Valve is right on the merits, the statute does not apply and notice is beside the point. If Valve is wrong, then the statute said what it meant and Valve did what it prohibits. There is no middle ground in which the statute covers Valve's conduct but Valve could not have known.

Fair notice, in any event, is an objective test. The question is whether the law gives "a person of ordinary intelligence fair notice of what is prohibited." *United States v. Williams*, 553 U.S. 285, 304 (2008). Valve takes real money, randomizes outcomes by algorithm, and delivers items worth three cents or three hundred dollars depending on the result. A person of ordinary intelligence reading RCW 9.46.0237 does not need a prior case about loot boxes to understand what that statute prohibits. And the regulators who have examined Valve's system confirm the point. Despite Valve's claim that "[n]o one of common intelligence would understand Valve's mystery boxes to be prohibited[,]" Mot. at 20-21, the Belgian Gaming Commission and the Netherlands Gambling Authority each independently determined that loot boxes constitute gambling under their national laws—and Valve shut its loot boxes down in both countries. ¶ 69. And in 2018, the Ninth Circuit applied Washington's gambling statute to a virtual casino and found a violation. *Kater*, 886 F.3d at 787–89. Valve did not lack notice. It lacked enforcement.

Valve points to district court decisions analyzing California law that have no bearing on whether Valve had notice of the application of *Washington's* gambling laws to its loot boxes. Mot. at 20 (citing *Mai*, *Coffee*, *Taylor*, and *Mason*).

Valve's remaining authorities are inapposite. *FCC v. Fox TV Stations, Inc.* penalized conduct that predated the prohibition, 567 U.S. 239, 254 (2012); Washington's gambling statute has existed since 1879. *State v. Williams* involved a statute with "no meaningful definition" of its key term, 144 Wn.2d 197, 202–03 (2001); here, the legislature defined every operative term in the



statute itself. [8] Valve also seizes upon a footnote in *Kater* and a handful of district court decisions analyzing California law to argue that unsanctioned sales of virtual items cannot make them things of value. Mot. at 21. But "Washington law does not limit a virtual chip's value to whether it can be exchanged for cash or goods." *Larsen*, 737 F. Supp. 3d at 1087.

Valve resorts to the rule of lenity as a fallback, but that rule has no bearing on the civil statute underlying Plaintiffs' claim. *See FTC v. Amazon.com, Inc.*, 735 F. Supp. 3d 1297, 1332 (W.D. Wash. 2024) (Chun, J.) ("Because the Ninth Circuit has stated that the rule of lenity only applies to criminal statutes, the Court declines to apply it here.").

Plaintiffs bring a civil claim under a civil recovery statute, RCW 4.24.070. The fact that the definitions the RMLGA borrows—"gambling," "thing of value," "contest of chance"—are found in RCW 9.46, a chapter that includes criminal provisions, does not change the analysis. The provisions Valve asks this Court to construe are definitional sections. They do not impose criminal sanctions. The Washington Supreme Court has declined to apply lenity in that circumstance. *Saucedo v. John Hancock Life & Health Ins. Co.*, 185 Wn.2d 171, 184 n.4 (2016) (declining to apply lenity where the specific provision at issue "imposes no criminal sanctions at all").

And even if lenity applied, Valve has not shown that the statute is ambiguous—much less "grievously ambiguous," as the canon requires. *United States v. Shill*, 740 F.3d 1347, 1355 (9th Cir. 2014). Ambiguity "must arise from the language of the statute itself, not from considerations outside the statute." *Brown v. Old Navy, LLC*, 4 Wn.3d 580, 587 (2025). Nothing in the text is ambiguous. Valve simply disagrees that the text describes what Valve does. That is an argument about scope, not clarity.

**C.     Valve's loot box scheme is a violation of the CPA.**

A CPA claim requires five elements: (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to the plaintiff's business or property, and (5) causation. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wn.2d 778, 780 (1986). Valve contests only the first and fifth.

---

[8] Valve's other cited cases are distinct. In *Shark Fins*, the court found the statute ambiguous because a cargo vessel purchasing fins at sea bore no resemblance to a "fishing vessel," 520 F.3d 976, 980 (9th Cir. 2008). And in *Jimenez,* the government itself conceded the part at issue "d[id] not perfectly fit the . . . definition." 191 F. Supp. 3d 1038, 1041 (N.D. Cal. 2016).

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - 20
Case No.: 2:26-cv-00788-JHC
011372-11/5072932 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

Elements two through four are straightforward. Valve's sale of loot box keys is trade or commerce. The public interest element is supplied by the legislature's declaration that gambling must be strictly regulated to prevent its commercialization. RCW 9.46.010. And Plaintiffs' injury—money diminished by unlawful conduct—is established in Section III.A.3, *supra*.

The first element is met. Under Washington law, a statutory violation can "demonstrate that an action violates public policy and is unfair for the purposes of a non-per-se CPA violation." *Schiff v. Liberty Mut. Fire Ins. Co.*, 2 Wn.3d 762, 772 (2024) (citing *Klem v. Wash. Mut. Bank*, 176 Wn.2d 771, 787 (2013)). *Larsen* applied that framework to social casino games constituting illegal gambling under Washington law and entered judgment on the CPA claim. 737 F. Supp. 3d at 1088–89. In *G.G.*, a court in this District denied Valve's own motion to dismiss a CPA claim arising from the same loot box system, crediting allegations that Valve designed its loot boxes to replicate the look, feel, and sound of a slot machine, operated without a gaming license, and failed to disclose odds. 2020 WL 7385710, at *7–8. The Complaint alleges the same conduct. ¶¶ 37–38.

The fifth element is met as well. Valve argues that Plaintiffs' causation allegations are conclusory. Mot. at 22. But the causal chain here is direct: Plaintiffs paid money to Valve to open loot boxes, the loot box system is the unfair act, and the money Plaintiffs paid is the injury. There is no intervening step. *Larsen* found identical causation sufficient—"but for High 5's illegal social casino operations, he would not have lost money purchasing their virtual coins." 737 F. Supp. 3d at 1089.

Valve contends the First Amendment shields its game design, citing *Courtright v. Epic Games, Inc.*, 795 F. Supp. 3d 1156, 1167 (W.D. Mo. 2025), *Angelilli v. Activision Blizzard, Inc.*, 781 F. Supp. 3d 691, 697 (N.D. Ill. 2025), and *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786 (2011). Each involved regulation of the content of video games—their violence or alleged addictiveness. This case challenges the operation of a gambling business through a video game. The *G.G.* court evaluated the same design allegations Valve now characterizes as protected expression and held they stated an unfair practice, not protected content. 2020 WL 7385710, at *7–8. The First Amendment does not immunize an illegal gambling scheme because it runs inside a game.

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - 21
Case No.: 2:26-cv-00788-JHC
011372-11/5072932 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

**D.      Unjust enrichment is successfully pled.**

Valve argues the unjust enrichment claim stands only if the gambling claims do. For the reasons discussed above, the gambling claims survive and so does the unjust enrichment claim.

Valve next argues that unjust enrichment is unavailable because Plaintiffs have a contractual relationship with Valve under the SSA. But Washington courts have made clear that where the validity of a contract is in question, there can be no bar to claiming unjust enrichment. *Aponte v. Mason Cnty. Fire Prot. Dist. No 16*, 641 F. Supp. 3d 1016, 1034 (W.D. Wash. 2022). Valve's wagering contract is invalid—it violates Washington law, is against Washington public policy, and is thus "void ab initio." *Davidson v. Hensen*, 135 Wn.2d 112, 130 (1998); *Failor's Pharm. v. Dep't of Soc. & Health Servs.*, 125 Wn.2d 488, 499, 886 P.2d 147 (1994). Because Valve and Plaintiffs do not have equal culpability, any benefit conferred upon Valve as a result would be unjust. Other courts in this district have allowed unjust enrichment claims to proceed where the underlying contracts were alleged to violate Washington gambling law. *Larsen*, 737 F. Supp. 3d at 1093.

**E.      Even if the Court finds against Plaintiffs, dismissal without prejudice is proper.**

Should the Court find the Complaint deficient in any respect, dismissal should be without prejudice, with leave to amend. Valve asserts futility in a sentence, but "[t]he standard for granting leave to amend is generous," and courts grant leave "unless the pleading could not possibly be cured by the allegation of other facts." *Chelan County v. Bank of Am. Corp.*, 2014 WL 3101935, at *5 (E.D. Wash. July 7, 2014).

## IV.      CONCLUSION

Valve took Plaintiffs' money. Valve randomized the outcome. Valve delivered a digital asset worth anywhere from a few cents to hundreds of dollars. Something was staked, chance determined the outcome, and something of value was received. Those are the three elements of gambling under RCW 9.46.0237, and the Complaint alleges each one. The CPA claim follows directly: two courts in this District have held that a violation of Washington gambling law constitutes an unfair act. The motion should be denied.

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - 22
Case No.: 2:26-cv-00788-JHC
011372-11/5072932 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

I certify that this memorandum contains 8,395 words, in compliance with the Local Civil Rules.

DATED this 16th day of July 2026.

Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By: */s/ Steve W. Berman*
        Steve W. Berman (WSBA #12536)
By: */s/ Moses Jehng*
        Moses Jehng (WSBA #64333)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com
moses.jehng@hbsslaw.com

Ben Harrington (*pro hac vice*)
Rio S. Pierce (*pro hac vice*)
Roxana Moussavian (*pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
benh@hbsslaw.com
riop@hbsslaw.com
roxana.moussavian@hbsslaw.com

*Interim Lead Counsel and Counsel for Alexander Flauto, Jackson Meyer, Ivan Galas, and Robert Brogan*

**MILBERG, PLLC**

By: */s/ Douglas H. Sanders*
        Douglas H. Sanders (*pro hac vice* forthcoming)
1311 Avenida Ponce De Leon, Suite 600
San Juan, Puerto Rico 00917
Telephone: (516) 206-7616
Facsimile:  (516) 282-7888
dsanders@milberg.com



Gary M. Klinger (*pro hac vice* forthcoming)
William J. Edelman (*pro hac vice* forthcoming)
Michael A. Acciavatti (*pro hac vice*)
**MILBERG, PLLC**
227 W Monroe Street, Suite 2100
Chicago, IL 60606
Telephone: (866) 252-0878
gklinger@milberg.com
wedelman@milberg.com
macciavatti@milberg.com

Adam E. Polk (*pro hac vice*)
Simon Grille (*pro hac vice*)
Fatima Ladha (*pro hac vice*)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile:  (415) 981-4846
apolk@girardsharp.com
sgrille@girardsharp.com
fladha@girardsharp.com

*Executive Committee Counsel and
Counsel for Carlos Matamoros*

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - 24
Case No.: 2:26-cv-00788-JHC
011372-11/5072932 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX

**CERTIFICATE OF SERVICE**

I hereby certify that on July 16, 2026, a true and correct copy of the foregoing was filed electronically by CM/ECF, which caused notice to be sent to all counsel of record.

/s/ *Steve W. Berman*
Steve W. Berman

PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS - 25
Case No.: 2:26-cv-00788-JHC
011372-11/5072932 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE  (206) 623-0594 FAX